**STAFFORD, Estate of, In re**

**OTIS, Plaintiffs-Appellants, v THE UNION TRUST COMPANY, et, Defendants-Appellees, Defendants-Appellants.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 19,929.   Decided September 18th, 1946.

Julius Bloomberg, Eugene E. Wolf, Joseph G. Stashower, Cleveland, for Margaret Ranney Otis, Guardian.

Friebolin & Byers, for Carl D. Friebolin, Guardian, Cleveland.

Harold O. Ziegler, Cleveland, for The Union Trust Co.

Baker, Hostettler & Patterson, Cleveland, for Union Properties, Inc.

James B. Dolphin, Cleveland, for Frankland Stafford and McRea Parker.

McConnell, Blackmore & Cory, for Winifred Stafford Parker and John McRea Parker, Cleveland.

Blakely, Ostrander & Blakely, for Harry R. Collacott, Guardian of Olive Maude Stafford Crum, Painesville.

Hugh S. Jenkins, Columbus, and Harold O. Ziegler, Cleveland, for Superintendent of Banks.

HILDEBRANT, PJ, MATTHEWS & ROSS, JJ, of the First Appellate District, sitting in Cuyahoga County by designation.

## OPINION

By ROSS, J.:

That this is an appeal upon questions of law has been decided by the Supreme Court of Ohio in **In Re Estate of Stafford, 146 Oh St 253.**

That decision fixed the nature of the proceeding in the Probate Court, the questions involved, and the rights of the parties, subject to the proper inferences to be drawn from the record.

It determined that where fraud or collusion, or a violation of rights which are saved by statute to persons under disability is shown in a proceeding involving exceptions to the final account of executors, the approval of such final account by the Probate Court is vacated. (Par. 6, Syllabus.)

The decision also determined that as far as the exceptions in the instant case are concerned, no limitation of time existed against asserting fraud and collusion in the administration of the estate or that the rights of parties under disability were violated by the approval of the final account of such executors. (Par. 7, Syllabus.)

And finally, it was determined that the proceeding in the Probate Court now under review was an incident in the administration of such estate and there is no authority for filing a separate independent proceeding to question such approval of the final account of the executors. (Par. 8, Syllabus.)

Even although the proceeding in the Probate Court was considered by all parties and the court as an adversary proceeding involving pleadings and issues, the effect of the decision of the Supreme Court was to determine that such proceeding only presented one principal question for the consideration of the trial court:—Did the evidence presented show fraud and collusion on the part of the executors in the administration of the estate? All other questions are subsidiary to this basic inquiry.

The trial court found against the exceptors and sustained the approval of the final account.

An examination of the positions of the exceptors and executors as contained in their briefs and arguments develops that there is little serious dispute as to the controlling facts involved. The task, therefore, presented to this court is not to determine whether the trial court gave proper emphasis to the evidence, but on the contrary, whether the Probate Court drew the proper inferences from the evidence presented to it.

The following facts are considered pertinent to the issues:

Oliver M. Stafford died August 15, 1929, leaving a will he had drawn March 30, 1926. This will contained the following clauses:

"ITEM IV. All the rest, residue and remainder of my estate, of every kind, nature and description, real and personal, wherever the same may be situated and whenever by me acquired, I give, devise and bequeath to The Union Trust Company, of Cleveland, Ohio, or its corporate successor, and to my said son, Franklin Fish Stafford, and my son-in-law, John McRea Parker, (who are also nominated as executors of this my last will and testament), in trust, nevertheless, for the uses and purposes hereinafter in this item contained.

"With respect to the trust estate and any shares into which it may be divided, said trustees shall have full power and authority to do all things that an absolute owner might do, and among other things shall handle, manage, control, lease for any term irrespective of the duration of the trust, bargain, sell, transfer, convey, allot, invest and reinvest

the same or any part thereof upon such terms, under such conditions and in such manner as they in their discretion shall deem for the best interest of the trust estate, all limitations and restrictions as to the investment of trust funds now or hereafter enacted or prescribed being hereby expressly waived. In the performance of their duties said trustees are authorized and empowered to comply with all legal requirements as to the execution of deeds, leases, or other writings, documents and formalities, without the order of any court. No person dealing with said trustees shall be bound to inquire concerning the validity of any act of said trustees or be liable for the application of any money or other consideration paid or loaned by such person to such trustees.

"In the care, management and preservation of the trust estate said trustees shall have full power and authority to apportion gains, losses and expenses, including their reasonable compensation, to principal and to income as they shall deem equitable, and their decision as to what is income and what is principal shall be final and conclusive. I request that my said trustees act in such capacity without bond.

"Upon the death, resignation, refusal or inability of my said son and son-in-law, or either of them, to act as executor or trustee hereunder, said Trust Company or its corporate successor shall have full power to act as joint or sole executor or trustee, as the case may be. In case of any difference of opinion between them as such executors or trustees, the decision of said Trust Company shall be final and conclusive.

"From the net income derived from the trust estate my said trustees shall pay in quarterly installments the sum of Twenty-five Thousand Dollars ($25,000.00) per annum to my said wife, Maude E. Stafford, during her natural life, which said sum shall be conclusive in favor of my said wife; but any portion of such income not drawn by or paid to her during her natural life shall not be treated as a part of her estate but shall remain a part of my estate and be distributed accordingly. Said quarterly payments shall begin immediately after my death. If the net income derived from the trust estate shall not in any year during the time of her life, reach said sum of Twenty-five Thousand Dollars ($25,000.00) per annum, the trustees may in their absolute discretion use such part of the principal of the trust estate as they may deem necessary for the support and comfort of my said wife."

The Superintendent of Banks took over The Union Trust Company for liquidation June 15, 1933. The estate at that time was worthless, due to the depreciation in the stocks held by the estate.

The will contains no specific instruction to executors or trustees requiring them to retain any particular asset of the estate.

The estate inventoried in December, 1929, for $886,313.17. No account except the final account was filed by the executors, and the provisions of the will for the creation of certain trusts were not carried out. The executors borrowed certain sums of money from Maude E. Stafford, the widow of the testator, for the purpose of paying a debt of the estate to the Manhattan Company of New York, whereby certain collateral held by the creditor was released to the estate. This loan from Maude E. Stafford, amounting to some $35,000.00, was paid to her estate by the transfer of certain stocks in 1933, under authority obtained from the Probate Court.

The stocks so transferred for the satisfaction of a debt of $35,000 were originally inventoried for $195,558.00.

On August 1, 1934, the Superintendent of Banks assessed against the estate the sum of $150,000 because of the ownership by such estate of 6000 shares of the stock of The Union Trust Company. The facts incident to the attempt of the Superintendent of Banks to collect such assessment from the estate will be considered hereinafter.

Practically the entire estate consisted of stocks in various corporations which could have been sold at figures gradually decreasing from the values at which they were appraised on December 15, 1929 to September 15, 1933, when they were, with the exception of the stocks transferred to the Maude E. Stafford estate, worthless.

Some of the stocks had taken a sudden spurt in value from the date of testator's death until shortly before the economic collapse October 29, 1929.

Two promissory notes, each in the principal sum of $3,-750.00, due the estate from the individual executors were in 1933, surrendered to such executors, under order of court as payment for services as such executors.

The testator had a long and effective connection with The Union Trust Company and its antecedents. When the Trust Company was organized in 1921 he became the owner of 2,000 shares of stock of The Union Trust Company in

payment for his holdings in companies it absorbed. He became a member of the Board of Directors and a Vice-President in the Trust Company, which position he retained at the time of his death. A split in the shares of the capital stock of four to one accounts for the increase in his holdings at the time of death. He had in 1927-1928 sold 500 shares "in the interest of diversification."

The testator was one of the organizers of The Cleveland Worsted Mills Company and its president up until a year before his death, when he became Chairman of the Board of Directors.

He increased his holdings in that company from time to time up until 1928, and died possessed of 3013 shares of stock in the Company.

His connection with the Sheriff Street Market & Storage Company is quite similar, acting as its president at the time of death.

There is evidence involving the position of the Superintendent of Banks in a certain action filed by him in the Common Pleas Court of Cuyahoga County.

It appears that the Superintendent of Banks applied for authority from the Probate Court to institute an action on behalf of the estate to recover certain assets which he claimed were wrongfully transferred out of the estate. These assets consisted of the stock transferred to the Maude E. Stafford estate, in payment of the debt of the estate of Oliver M. Stafford to Maude E. Stafford and the notes of the individual executors Stafford and Parker, which had been transferred to them in payment of executors' fees. A number of peculiar features are apparent in the position of the Superintendent of Banks in this action. Although it was made to appear that the Superintendent of Banks was acting **on behalf** of the estate as a successor co-executor, in his application to the Probate Court for authority to sue it is obvious that the real purpose of the action was an endeavor to secure some assets out of which at least a part of the $150,000 double liability assessment against the estate might be collected. The dual and inconsistent position of the Superintendent of Banks cannot be approved. The net result of the proceeding was to secure for him $15,000 which was **not** paid out of the Oliver M. Stafford estate. Fraud in connection with this action is also asserted in view of the fact that the executors received a release from all claims by the estate against them

and that the Maude E. Stafford estate and the individual executors were permitted to retain the stocks and notes transferred from the Oliver M. Stafford estate.

It is the conception of this court that even if the incidents attending this action of the Superintendent of Banks be considered questionable, they can have no bearing upon the principal question involving misconduct on the part of the executors. That misconduct, if it existed, and whether it consisted in absolute or constructive fraud, negligence or collusion, or mere violation of statutory mandates, occurred between the date of their qualification, September 15, 1929, and June 15, 1933, when the Superintendent of Banks took over The Union Trust Company for at that latter date the stocks remaining in the estate were worthless, except as hereinbefore noted.

Any misconduct in the administration of the estate to be effective as a basis for any charge of fraud or culpable negligence must have occurred between those dates.

Limiting the present charges of the exceptors, therefore, to the period when any misconduct of the executors was effective to injure the estate:— The exceptors charge that such misconduct of the executors consisted in (1) retaining the stocks in the estate in the presence of a falling market; (2) in failing to obey the mandate of the law requiring them to reduce such stocks to more stable securities, and pay the debts of the estate; (3) in retaining the stock of The Union Trust Company, when it was a co-executor of the estate.

(1) One contention of the exceptors may be disposed of at once.

An examination of the record sustains the conclusion of the Probate Court that no actual fraud or collusion on the part of any of the executors was shown.

The nearest approach to any inference sustaining such charge was that it would have been to the disadvantage of The Union Trust Company during the period mentioned to sell any considerable portion of the Trust Company stock, in view of the connection of the testator with the Trust Company at the time of his death. The years after October 29, 1929 were trying times. Holders of the stock of the Trust Company were confronted with a dilemma to sell or keep their stock. Certainly, had the entire holding been offered, disaster would have followed. It is contended that the 6,000 shares could have been fed in gradually without ill effects upon the institution and the remaining holdings. Such a contention invades the field of speculation and conjecture.

The discretion of the executors upon this basis may not be impugned. The interests of the estate and the Trust Company were closely identical. Fraud may not be predicated upon the premise that the same action which was deemed favorable to interests of the estate happened also to be considered a proper course to save the Trust Company as a whole. It is apparent that there were many persons who considered the economic failure only a temporary depression and that the wise course was to retain stocks and even buy more at the falling prices.

There is mentioned in the record an instance of a large loan made to one Painter by the Trust Company in order that he might purchase Trust Company stock. In the brief of appellants appears the following:

"On July 1st, 1930, Painter's loans from The Union
    Trust Company were                $950,000.00
On October 1st, 1931, Painter's loans were   3,100,000.00
    (Plaintiffs' Exhibits 23, 23a.)

"A large part of the proceeds of these loans was actually used to purchase 13,680 shares of The Union Trust Company stock, between the period from November 24th, 1930 to September 30th, 1031."

Whether the stocks in the estate were rising or falling in value, the same dilemma was presented—whether it was for the best interest of the estate to sell. Error in judgment shown by later developments would have entailed bitter criticism of the action taken in either event. If the stocks had continued to rise after sale by the executors they would have been charged with the same bad faith of which they are now accused because they did not sell in face of the later falling market.

It must be borne in mind, and this fact seems to be lightly considered by the exceptors, that essentially the individual co-executors had each practically a 1/3 interest in the estate. Any action they took or failed to take therefore **directly affected their own personal interest.**

The care and diligence required of an executor is that which an ordinarily prudent man is accustomed to use in the conduct of his own affairs. **18 O Jur. p. 227, Sec. 180, et seq.**

It is thus apparent that as far as the individual executors are concerned they fulfilled this requirement in actual

fact, for these individual executors were in effect exercising judgment in their **own** affairs.

In this connection, it is the claim of the exceptors that the individual executors were dominated by the Trust Company under the provisions of the Stafford will. Neither the provisions of the will nor the evidence sustains this contention. Such inferences as may be drawn from the evidence indicate that the officers of the Trust Company and the individual executors operated in perfect harmony and were a unit in the course to be pursued, in view of the unusual and difficult situation presented by the overwhelming economic disaster precipitated on the nation as a whole.

The provision of the will relied upon by exceptors to show the dominion of the Trust Company over its co-executors does not sustain their position. It is only when a difference of opinion exists between the individual executors that the Trust Company may exercise its final judgment. No such difference of opinion between the individual executors is shown in the record, and, therefore, no occasion for the Trust Company to exercise the dominant power conferred by the provisions in the will existed.

Not only, therefore, is no actual fraud shown by the evidence, but the charges of negligence—and culpable bad judgment must fail. These executors had hardly qualified before the "crash" of October 29th, 1929 occurred. It is a matter of common knowledge, certainly a matter of which the trial court and this court could take judicial notice, even if it were not clear from the evidence, that overnight fortunes were swept out of existence.

It is charged that the executors should have sold. If they could have sold someone must have bought these stocks, as Painter did. It is apparent that two conflicting judgments would here be present, those of the buyer and the seller. Of course, later developments showed that the seller was wise and the buyer was foolish, but it is not the light of those later years that is to be employed in examining the judgment of these executors. It is, on the contrary, in the dim gloom of those uncertain years before the truth became only too apparent that the judgment of these executors is to be examined. They were placed much in the position of the captain of a ship who must make the decision to abandon ship or ride out the storm in his battered vessel. It is to be presumed that these executors selected by the testator were is as good a position, or even a better position, to exercise proper judgment and there is apparent no valid motive

which would justify a conclusion that these executors or any of them should do anything which was not for the best interests of all concerned.

The conclusion of the Probate Court that the mere failure to sell the stocks did not sustain either a charge of actual fraud or culpable negligence must be sustained.

(2) As to the second contention, it is somewhat difficult to harmonize the position of the exceptors in their brief in chief with that taken in their reply brief. The Probate Court understood their claim to be that the statutes providing for the administration of estates required the sale of stocks as a performance of the requirement to collect assets. Certainly, such a contention of the position of the exceptors is justified by their statement in their brief in chief. However, in their reply brief, in commenting on the opinion of the Probate Court, they say:

"Of course, there was no 'absolute duty to sell all the securities' as the Court wrongly assumed that we were contending, but there was an absolute duty to administer according to law and to sell them or do something else about them as the law and the will and common prudence required."

This then brings us back to the original contention that a proper exercise of the discretion reposed in the executors required them to sell the stocks.

This second contention is merely, therefore, a different way of stating their first contention, and the conclusion thereon is, therefore, the same.

(3) The last principal contention of the exceptors is that the executors and particularly the Trust Company violated their official obligations in derogation of the interest of the estate by not selling the Trust Company Stock—because the Trust Company by holding the stock as a co-executor placed itself in a position of dual loyalty—loyalty to the interests of the Company and fidelity to the estate, and for this reason the final account should not be approved, since such violation of duty was the cause of loss to the estate. And in support of this contention exceptors cite the cases of:

**In Re Estate of Binder, 137 Oh St 26; and**

**In Re Trusteeship of Stone, 138 Oh St 293.**

Paragraph 4 of the syllabus in the Stone case is:

"A corporate trustee may not acquire its own shares of stock as an investment for a trust in its charge, or retain its own shares in the trust, unless express authorization therefor is contained in the instrument creating the trust, or in a provision of law."

There is no specific provision in the will of the decedent giving express authorization to the executors to retain the Trust Company stock. On the contrary, they were given full power to control the assets of the estate, and as complete power as if they were the sole owner of such assets. This particular charge, it is manifest, can only apply to one of the executors—the Trust Company.

As stated before, there is no evidence that the individual executors were dominated by the Trust Company. The individual executors are free from any charge of dual fidelity. Is the final account to be approved as to them and disapproved as to the Trust Company? Having disapproved the final account, may an action be maintained against the Superintendent of Banks surcharging him for the total loss to the estate—thus permitting the individual co-executors to share in such recovery to the extent of a third each?

As hereinbefore pointed out, the mere retention of the stocks may now only be considered the exercise of a discretion, which later developments showed to be contrary to the best interests of the estate. Had the Trust Company been sole executor the same would have been true, but it would have been held culpable (if the rule applies to an executor as well as trustee) solely because of the decision in the Stone case. That decision is predicated upon the premise that:

"Since a trustee is a fiduciary of the highest order and is charged with the utmost fidelity to his trust, he must refrain from creating situations where his own interests are brought into conflict with those of the trust, and from doing those things which would tend to interfere with the exercise of a wholly disinterested and independent judgment. In accepting a trust, the trustee is presumed to know the obligations and limitations connected with his high office and, if he transgresses, must abide the consequences."
(page 302 opinion)

It is apparent that the situations prevailing in the Binder and Stone cases are entirely different from those prevailing in the instant case.

The facts in this case show a situation where a high officer of the Trust Company, which he had a large part in guiding up· to a position considered at least before 1929 as being of the best, in which he had invested a considerable portion of his fortune, saw fit in drawing his will to make such Trust Company one of his executors and trustees with his son and son-in-law. He gave it the power to cast a deciding vote in case of a difference of opinion between the individual executors. The testator died retaining this confidence both in the value of the estate stocks and his named executors and trustees. This must be inferred in the absence of change in his will made in 1926. If the testator's son and son-in-law had decided to sell the stocks they would have been sold, since the Trust Company only controlled in the presence of a division between them.

It will be noted that the confidence of the testator extended even to permitting the Trust Company to act as "sole executor or trustee" in the event of resignation or death of other executors or trustees.

Of course, the decisions in the Binder and Stone cases had not been written in 1929. Apparently, however, the fears for the effect of dual loyalty entertained by the Supreme Court were not shared by the testator.

No reason appears for extending the conclusions announced in the Binder and Stone cases to situations not covered by the facts furnishing a setting for such decisions.

This court is not prepared to say that the mere retention of the stock of a Trust Company, by such Trust Company, acting as one of three executors, all of whom agree in considering it for the best interests of an estate to so proceed, furnishes a basis for the application of the law pronounced in the Binder and Stone cases.

No attempt has here been made to pass upon all of the many subsidiary contentions of the exceptors. For example, it is the contention of exceptors that the Superintendent of Banks was culpable in not filing an action as successor executor against himself as Superintendent of Banks, successor to the Trust Company. Passing the complicated reasoning upon which such contention is based, this contention falls back upon the principal question involved. If the executors up to the time the Superintendent of Banks took over the Trust Company were guilty neither of actual fraud nor culpable negligence, as the Probate Court and this Court has found to be· justified from the reasonable inferences from

the evidence, then there was no claim or cause of action existing which the Superintendent of Banks in one character could assert against himself in another.

The entire structure of the exceptors' case rests upon the three predicates considered.

It is the conclusion of this Court that the inferences drawn by the Probate Court from the evidence were justified by reason and law, and that the action of the Probate Court in sustaining the approval of the final account must be affirmed.

HILDEBRANT, P J, MATTHEWS & ROSS, JJ, concur in syllabus, opinion and judgment.