**REES, Estate of In Re; HUTCHINS, et, Plaintiffs-Appellants, v. CLEVELAND TRUST CO., Trustee, Defendant-Appellee.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 20864.    Decided January 7, 1949.

386

McAfee, Grossman, Taplin, Hanning, Newcomer & Hazlett, Cleveland, for plaintiffs-appellants.

Baker, Hostetler & Patterson, Cleveland, Douglas, Stark, Jett & Biechele, for defendant-appellee.

(Judges of the Ninth District sitting by designation in place of Judges of the Eighth District.)

## OPINION

By DOYLE, PJ.

William D. Rees, at his death on July 5, 1910, left a will in which he devised and bequeathed most of his property to The Cleveland Trust Co., in trust for various uses and purposes. Shortly thereafter The Cleveland Trust Co., as trustee of the testimentary trust thus created, received from itself as executor of the estate, property having a value of approximately $1,473,707. The trust company has administered this trust as sole trustee continuously from the date of its appointment to the present time.

From time to time over the years, partial accounts were filed in the Probate Court of Cuyahoga County by the trustee. Finally, in 1939, exceptions were filed to the fourteenth and prior partial accounts. Later, certain of these exceptions were withdrawn, and the case now under consideration finally came on for trial in the Probate Court on the second amended exceptions to the fourteenth and prior partial accounts of the trustee (filed April 18, 1944).

The exceptors are all of the living beneficiaries of the trust and are identified as follows: Mrs. Marian R. Hutchins and Dr. H. Maynard Rees, daughter and son, respectively, of the testator, life tenants; Henry Maynard Rees, Jr., Homer McKeehan Rees, Morgan Van Allen Rees and Elihu Pugsley Rees, minor children of Dr. H. Maynard Rees, remainderman, who now as a class have a vested remainder in the entire estate. These minors are represented by William A. McAfee, their acting guardian.

After a protracted hearing, resulting in volumes of transcript and exhibits, the Probate Court overruled all of the exceptions and entered its judgment thereon. This court now encounters the litigation, in this appeal on questions of law.

A summary of the investments made by the trustee, of which complaint is made, and the grounds asserted for surcharging the trustee, is presented by the appellants as follows:

| Investments and Amounts | Grounds for Surcharge |
|---|---|
| 1. Bolton Fee Land Trust Certificates, .$50,000. Higbee Fee Land Trust Certificates, $76,000. Kimbal Fee Land Trust Certificates, $2,000. | 1. The trustee had no authority under the will or statutes of Ohio to invest in land trust certificates; and<br><br>2. The trustee purchased the certificates from itself, in violation of its duty of undivided loyalty to the trust. |

2. Bankers' Joint Stock Land Bank of Milwaukee Bonds, $24,050.

The trustee purchased these bonds from itself and took a secret profit, in violation of its duty of undivided loyalty to the trust.

3. Continental Shares, Inc., preferred stock, $25,625. Continental Shares, Inc., common stock, $33,446.50. Union-Cleveland Corporation stock, $9,640.

1. The stock was speculative and wholly unsuitable for trust investment.

2. The purchases were imprudent because an unduly large percentage of the trust (71%) was already invested in stocks.

3. The purchases constituted an unlawful delegation of the trustee's investment powers.

It is asserted by the appellants that the court erred in overruling their exceptions, and that this court should reverse the conclusions of the trial court and enter judgment in favor of the exceptors, sustaining the exceptions to the accounts of the trustee and surcharging the trustee. And, in addition to above, the appellants further claim error in the court's refusal to sustain exceptions to the allowance of compensation to the trustee, because "In view of the many and serious breaches of trust, resulting in a tremendous loss to the trust estate, the trustee has forfeited and should be denied all or a major portion of its compensation previously allowed."

1. Did the Probate Court err in holding that the trustee had authority to invest in land trust certificates?

The testator, after granting power to the trustee to sell property in the corpus of the trust, provided (under Item Third of his will):

"I further confer upon said trustee authority to invest proceeds arising from the sale of said property in government, state or municipal securities, or in such other stocks, mortgage loans or **securities** as it may deem for the best interest of my estate, giving to said trustee absolute discretion as to the price, terms, conditions, rate of interest and yield in respect to such loans and investments and authority to vary or transpose the same into **others of like or similar nature,** deemed suitable for the investment of trust funds. Said trustee shall not be obliged to convert any stocks or securities which I may own at the time of my decease into other securities, but may, at its option, retain the same without liability upon its part for depreciation or loss." (Emphasis ours.)

At the time that the land trust certificates in question were

purchased, it was the common practice of many Ohio trr companies to make such investments for trust estates under their control.

"Ipso facto investments of that kind were then lawful. These certificates represent an undivided interest in the equitable ownership of real property, legal title to which is held by a trustee for the benefit of certificate holders.

The ordinary method of creation is for the owner of the legal title of the real estate selected to transfer it by deed to a trustee, who simultaneously executes a long term lease either to the owner, some other person, or sometimes to a corporation organized for the purpose of the transaction. Certificates of beneficial interest in a determined amount are then issued by the trustee under a declaration of trust and sold to investors. The rental stipulated in the lease to be paid to the trustee is fixed at a sum sufficient to produce a stated income * * *." In re Trusteeship of Stone, etc., 138 Oh St 293, at p. 296.

The question first presented is whether the word "securities" used in the will has a connotation or any implication of something more than the primary meaning, sufficient to cover these investments, especially when considered in the light of the grant of power "to vary or transpose" investments "into others of like or similar nature, deemed suitable for the investment of trust funds."

The word "security" in its limited meaning is used of obligations which are ordinarily paid in money and for which specific property is bound. 3 Page on Wills (Lifetime Ed.), Sec. 977. The word, however, is generally employed by men of business to describe a broad class of financial investments and includes by the clear preponderance of authority preferred or common stocks, bonds, ground rents, and a variety of other investments. See 56 C. J., Securities, p. 1278, et seq.; 2 Scott on Trusts Sec. 227.14, at p. 1228.

"In the Matter of Vanderbilt's Estate, 132 Misc. 229 N. Y. S. 631, 635, it was said that the testator 'must be deemed to have used the word "securities" in the vocabulary of ordinary life, and not in any technical or narrow sense. In the general usage of speech employed by men of business affairs, the word "securities" is used in its widest sense to describe the broad class of financial investments'; and in the Matter of Waldstein, 160 Misc. 763; 291 N. Y. S. 697, 700, the Court used this language: 'Those instruments, however, secured or unsecured, which are

used for the purpose of financing enterprises and promoting a distribution of rights in or obligations of such enterprises, and which are designed as a means of investment, are termed securities.' In the Matter of Rayner (1904) 1 Ch. 189, one of the Law Judges observed that the word 'securities' was a flexible word, and that he recognized that it is widely used as a synonym for investments."

Trustees of Protestant E. Church, v. Equitable Trust Co., 24 Atl. (2d) 327, at p. 329.

In the case cited immediately above, the Supreme Court of Delaware determined that rights under instruments designated as "mineral deed" and "sale of oil and gas royalty," which were executed with the formality of a conveyance of land but conveyed only a fractional interest in the property described, were "securities" within the popular usage of the word and could be used to complete the legacy.

It has been held also that ground rents come within the meaning of the word "securities." A ground rent may be defined "as a rent reserved to himself and his heirs by the grantor of land, out of the land itself. It is not granted like an annuity or rent charge, but is reserved out of a conveyance of the land in fee. It is a separate and distinct estate in itself and is held to be real estate with the usual characteristics of an estate in fee simple." 32 Am. Jur., Landlord and Tenant, Sec. 1039.

And see: In re Gent and Eason's Contract, 74 L. J. R., Ch. Div., 333; In re Tapp, 74 L. J. R., Ch. Div., 523.

The Supreme Court of Ohio in In re Estate of Binder, supra, and In re Trusteeship of Stone, supra, used the word "securities" as descriptive of land trust certificates of the kind involved in this litigation. And, while the meaning of the word was not then under consideration, nevertheless, the court undoubtedly used the word advisedly and gave to it its popularly recognized meaning.

It appears to the members of this court that the testator, a man of wide business experience in the world of finance and investment, used the word "securities" in the broad sense and that he intended the word to mean investments of the kind evidenced by equitable interests in real property known as land trust certificates.

The ruling of the trial court on this question was amply justified by the evidence.

2. Did the evidence justify the trial court's ruling that none of the investments in land trust certificates constituted self-

dealing by the trustee and consequently not a violation of its duty of undivided loyalty?

As heretofore noted, the case is before this court as an appeal on questions of law, and it is the duty of this court to determine whether there is evidence of sufficient probative value to sustain the trial court's conclusions. We must weigh the evidence and all reasonable inferences to be drawn therefrom pertinent to the issues, and if after such labors we can say that different conclusions might rationally be drawn therefrom by men of ordinary prudence, equally sensible and impartial, and that the judgment is not manifestly against the weight of the evidence, it is our duty to affirm. This court is not the trier of the facts, and it is not our province to substitute our judgment for that of the trial court. On the other hand, if it be found that there is no evidence to sustain the court's conclusions or that they are otherwise contrary to law, or that they are manifestly against the weight of the evidence, it is our duty to reverse.

(A)  Bolton Fee Land Trust Certificates.

Pursuant to recommendation of its Estates Trust Committee, the Board of Trustees of The Cleveland Trust Company by resolutions passed on September 6, 1923, and October 4, 1923, authorized the acquisition of the property referred to as the "Bolton Fee," and said property was acquired by The Cleveland Trust Company from The Union Trust Company on November 30, 1923, and on the same day the grantee paid $700,000 for it out of its own general funds. This purchase was made pursuant to authority granted by grantee's directors in furtherance of a plan to create a trust in the property and issue land trust certificates thereon. On November 22, 1923, the property was leased to The Seventy-One Hundred Euclid Co. for a term of 99 years. The lease called for an annual rental of $42,000. On December 13, 1923, The Cleveland Trust Company executed a declaration of trust in which it was declared that it would hold the property, together with the proceeds thereof, in trust for the use and benefit of all present and future holders of certificates of equitable ownership of the title.

The exceptors, as heretofore noted, charged the trustee with self-dealing when $50,000 was paid out of the Rees trust to the bank in exchange for these securities, evidencing an equitable ownership in the title.

At the time of this purchase, the terms of the will required the approval of all investments by H. Maynard Rees, one of the beneficiaries and one of exceptors herein. His approval not only was given, but it appears that these investments

were made following his specific request to the trustee that money in the trust res be so employed.

It is clear that this state requires of all trustees the duty of loyalty and will not countenance self-dealing.

"* * * the general rule is * * * that a trustee violates his duty of loyalty if he buys securities in his individual name, in connection with which he has derived a profit, pays the purchase price out of his own funds and then makes distribution among the various trusts of which he is the trustee. Self-dealing by the trustee thereby occurs, which the law will not countenance.

This may seem a harsh rule when applied to instances where there is no studied or deliberate design to do wrong and when the plan for the investment of trust funds is conceived and executed in good faith. However, the rule corresponds with most of the judicial pronouncements and with the best legal thought on the subject, and has been adopted by this court.

Since a trustee is a fiduciary of the highest order, and is charged with the utmost fidelity to his trust, he must refrain from creating situations where his own interests are brought into conflict with those of the trust, and from doing those things which would tend to interfere with the exercise of a wholly disinterested and independent judgment. In accepting a trust, the trustee is presumed to know the obligations and limitations connected with his high office and, if he transgresses, must abide the consequences."

**In Re Trusteeship of Stone, 138 Oh St 293, at p. 302.**
However:

"No question of self-dealing arises if the trustee never has any individual interest in the property. Where, however, the trustee advances its own money and takes a mortgage or group of mortgages as security for the loan and subsequently transfers participating shares to the trusts administered by it, the question is whether this is not in effect a sale of its individual property to itself as trustee, with the result that if the mortgages fall in value the trustee becomes personally liable for the loss. It would seem, however, that if the investment is otherwise proper, the mere fact that the trustee advanced its own money in the first place but acquired the mortgages for the purpose of distributing them among the trust estates administered by it and where only a short interval elapses between the purchase and the distribution, there is not such self-dealing as to make the transaction

improper. The trustee would rarely be able as a practical matter to advance the money in the first place wholly out of the trust funds of the various trusts, and the advance of its own funds is made not for the purpose of investing its own funds but for the purpose of obtaining an investment for the various trust estates."

2 Scott on Trusts, Section 170.14.

This rule is quoted with approval by the Supreme Court of this state in a case in which the following paragraphs of the syllabus establish the law:

"3. There is no legal inhibition against a trustee setting up a special or independent trust in property other than his own and acting as trustee for the securities issued thereunder, even though done for the sole purpose of selling such securities as an investment to other trusts from which he may also be trustee, provided the transaction is free from self-dealing or profit-taking on his own account, is fair, and is made in good faith as between the several trusts.

4. A trustee may advance money to purchase securities for his trust before all the money is available in the trust estate for that purpose, and may make a reasonable charge for the money so advanced; but the trustee may not purchase such securities in his own right, or acquire a beneficial interest therein before turning them over or allocating them to a trust for which he is trustee."

**In re Estate of Binder, 137 Oh St 26.**

It is claimed, inter alia, by the exceptors, that when the bank purchased the fee out of its own funds and later issued land trust certificates thereon, the entire $700,000 of certificates became an asset of the bank and was so carried on its books; and that in addition thereto the bank collected and retained the income on the certificates later transferred to the Rees trust up to the date of the transfer on March 6, 1924.

In connection with this claim of self-dealing, there is evidence in the record before us from which it may reasonably be found that one of the purposes for the creation of the Bolton land trust issue was to provide a medium of investment not only for persons generally but for the investment of money held in trust by the bank for various individuals, and that, prior to the issuance of any of these certificates of beneficial interest, the various trust officers of the bank were

given authority to make investment of the funds under their control in such issue when created.

The Probate Court overruled the exceptions to the purchase of this issue. There is evidence from which reasonable inferences may be drawn that the bank used its own money for these investments, not with the intention of beneficially owning them itself, but as a temporary measure for the purpose of creating a medium for the investment of funds, including funds which it held in trust for various persons.

Under the rule in In re Binder, supra, of course, a trustee cannot acquire a beneficial interest in the securities or purchase them in its own right before turning them over or allocating them to a trust for which it is trustee, but if, from the facts surrounding a purchase, the inference may be reasonably drawn that the investment was made not for the trustee's personal interest but for the sole interest of the trust; that it was made in good faith, and was fair; that it was never the intention of the trustee to acquire the beneficial ownership in the security for itself, but that the trustee held it on its books, for the sole purpose of mechanically allocating it to one of its trusts—then such a transaction presents sufficient evidence to warrant a trial court to find adversely to a claim of self-dealing. And especially is this true when it may be reasonably found that the securities were allocated to the trust before they came into existence, and the delay of several months before transfer to the trust of the exceptors is explained by evidence which is of the character as shown herein.

It appears that, after the land trust certificate issue came into being, and before the transfer to the Rees trust, the bank collected interest payments on the certificates in question. This, it is claimed, indicates a beneficial ownership of the certificates in the bank prior to the transfer to the Rees trust, and therefore proves self-dealing.

In this connection, the members of this court see no reason for departing from the general theory that undivided loyalty is not breached by the advance of a trust company's own funds to acquire property for allocation of participating interests therein to its various trusts; and that by parity of reasoning the receipt by the trust company of interest accruing on participating beneficial interests in property held by it for a short time between the acquisition and allocation, does not of itself render the transaction improper. There is no reason why the trust should "receive this unearned increment, rather than the bank, who had earned it in carrying the loans in aid of the trusts."

See—
Bank v. Basham, 191 So. 873.
2 Scott on Trusts, Sec. 170.14.

(B) The Higbee Land Trust Certificates.

The claim is made that the trustee was guilty of violating its duty of undivided loyalty and of self-dealing in the purchase of these certificates. They were purchased in the following amounts on the indicated dates: $70,000 on June 1, 1922; $3,000 on June 19, 1922; $1,000 On October 9, 1922; and $2,000 on November 16, 1922.

It appears that the property upon which these certificates were issued was, at the beginning, owned by the Mather family, and was encumbered by a lease owned by The Bailey Co. Parts of the premises were subleased to The Higbee Co., The Higbee Realty Co., and The Crowell and Little Construction Co. In the latter part of 1921 or the first part of 1922, one Benedict Crowell, of The Crowell and Little Construction Co., one of the lessees, negotiated with the Cleveland Trust Co. for a mortgage loan on the premises in furtherance of a plan for the lease or sublease of the premises from the owners. Later, it was decided to finance the project by the issuance of land trust certificates on the fee. Under the plan as developed, Crowell and Little agreed to attempt to procure the cancellation of all outstanding leases and encumbrances on the property, and to secure from the owners a transfer of the unencumbered title to the property to the Cleveland Trust Co. as trustee. It was then planned to issue land trust certificates evidencing equitable ownerships in the fee, and to organize a new corporation to take a 99-year lease, which corporation would in turn execute subleases to The Higbee Realty Co. and The Crowell and Little Construction.

On June 1, 1922, there was effectuated the plans heretofore noted: deeds were executed, encumbrances cancelled, a new 99-year lease made effective, as well as various subleases to the premises, and a declaration of trust was executed, upon which land trust certificates were issued. These certificates were 2800 in number, with a value of $1,000 each.

As heretofore noted, $70,000 of the issue was transferred to the Rees trust on the day of its creation. It is claimed by the exceptors that prior to the date of the issue, the bank had agreed to buy $900,000 of the issue, and, "Accordingly, on the closing date, the bank, if it was not to be forced to use its own individual funds, had to dispose of the $900,000 face amount certificates to its trusts, including the Rees trust, and this, of course, was done on June 1, 1922. Because the bank had undertaken to buy the land trust certificates

before it acquired them, its interest in disposing of them in part to the Rees trust, and thus avoiding buying them with its own funds for its own account, was fully as adverse to the Rees trust as if it had been the beneficial owner of the certificates at the time of the sale. The temptation in such a case is for a trustee to place his interests above that of his trust. In such circumstances it is a breach of the trustee's duty of loyalty to purchase the investment for the trust."

From the evidence it may reasonably be concluded that any agreement of the bank to take $900,000 of the issue was coupled with the action of the bank in authorizing such securities as a "line investment," which, under its rules, authorized its trust officers to purchase such investments. The conclusion may be further drawn that, by action of the various committees, there was a commitment of these certificates to the Rees trust before the date of their issuance, and at no time did the bank have any legal or equitable ownership in them.

Under the circumstances as depicted in the record, it appears to the members of this court that this transaction comes squarely within the provisions of the third paragraph of the syllabus of In re Estate of Binder, quoted hereinbefore; that the bank's commitment to take a certain amount of the issue was for the purpose of providing securities as an investment for its many trusts; that the transaction was free from self-dealing or profit-taking; was fair and was made in good faith.

As heretofore noticed, Higbee Fee certificates in the amount of $3,000 were purchased by the Rees trust on June 19, 1922. Exceptors claim that this purchase was a violation of the trustee's duty of undivided loyalty.

There is evidence which will reasonably support the conclusion that on June 1, 1922, the day upon which this land trust was created, an unidentified trust (one not identified in the record but appropriately called trust X) bought one hundred certificates and paid the purchase price direct to the fee owners. On June 16, 1922, the bank secured a transfer of these certificates to itself and paid trust X. Three days later, on June 19, three of the certificates were paid for by and transferred to the Rees trust.

"There is no legal inhibition against a corporation or an individual authorized to act in a trust capacity, from becoming a trustee of multiple trusts, or, according to the weight of authority, from transferring securities from one of its trusts to another by purchase and sale, provided the trus-

tee does not have a beneficial interest in, the securities so transferred, and provided the terms of the sale and purchase are fair and made in good faith as between the several trusts."

In re estate of Binder, supra, at pp. 32-33.

From an examination of this transaction, it may be reasonably found that the sale of the certificates to trust X was not tainted with self-dealing, and that the subsequent course of three of the certificates from trust X to the bank, and then into the Rees trust, constituted a transfer of the certificates from one trust to another, in which the transfer to the bank was made for the sole purpose of making them assets of the bank. The fact that there was an allocation of interest on the certificates to the bank, covering several days prior to the transfer to the Rees trust, does not prove the ownership in the bank, and comes within the same rule heretofore pronounced in respect to the Bolton Fee certificates.

Exceptions are further made to the Court's ruling in respect to the purchase of one certificate on October 9, 1922, and two certificates on November 16, 1922, by the Rees trust. Self-dealing and a violation of the trustee's duty of undivided loyalty are again asserted.

From the facts established and the reasonable inferences to be drawn therefrom, we do not find that the court's ruling in overruling the exceptions to these investments is either contrary to law or manifestly against the weight of the evidence.

(c) The Investment in The Kimball Fee Land Trust Certificates.

The exceptors charge self-dealing in the purchase of $2,000 of these certificates by the Rees trust.

The property constituting the Kimball Fee was conveyed to the Cleveland Trust Company by the owners thereof on July 31, 1922. The purchase price was $125,000. There is evidence indicating that the land trust certificate issue on this fee, held in trust by the Cleveland Trust Co., was created for trust investment. At the time of the conveyance by the owners, $6,000 on the purchase price was paid the owners from the funds of a trust then being administered by the Trust Co. The balance of the purchase price of $125,000 was evidenced by two mortgages: one to the Penn Mutual Life Insurance Co. for $69,000, and the other to C. K. Fauver for $50,000. Satisfactory evidence is lacking to establish the date of the creation and issuance of the several land trust certificates of this issue. After their issuance, however, the proceeds were used to discharge the initial payment and the mortgage encumbrances.

The exceptors specifically charge that "The purchase of the Kimball Fee Certificate was in violation of the trustee's duty of undivided loyalty on two grounds: first, the certificate was purchased from the bank and was the bank's individual property, and, second, the bank's interest in the sale was adverse to the trust for the additional reason that the proceeds of the sale were used to discharge the mortgages which the bank had assumed."

We do not find from the evidence that the bank ever was the beneficial owner of the certificates, nor that the bank had assumed the payment of the mortgages on the property.

It is reasonable, we believe, to draw the inference that the land trust issue was created progressively as the outstanding mortgages were discharged, and that the trial court's findings on this issue, adverse to the claims of the exceptors, are neither contrary to law nor manifestly against the weight of the evidence.

3. Was the trustee guilty of self-dealing in the sale of $24,050 worth of Bankers Joint Stock Land Bank of Milwaukee bonds to the trust?

The claim is made that in the purchase of these bonds the bank violated its duty of undivided loyalty to the trust in that it "was guilty of self-dealing and taking a secret profit."

The record shows that on August 10, 1921, the first block of bonds, having a par value of $10,000, was acquired by the Rees trust. They had been bought by the bond department of the bank on the same date from the brokerage firm of Harris, Forbes and Co. Again, on August 17, 1921, the bank bought, through the same brokers, a second block of bonds having a par value of $16,000. On the same date, these bonds were likewise transferred to the Rees trust and payment made therefor.

The exceptors specifically charge that the bank "bought the bonds with its own money for its own account, carried them on its book as its own assets, and then sold them to the Rees trust at a profit." As noted heretofore, the Probate Court overruled these exceptions.

"The principle that a trustee cannot properly sell his individual property to the trust is applicable to corporate as well as to individual trustees. A trust company violates its duty to the beneficiaries of a trust under which it is trustee if it purchases property from itself."

2 Scott on Trusts, Sec. 170.13.

"* * * courts do not sanction a sale by the trustee as an individual to himself as a trustee no matter how honest may have been the intention. If the cestui desires to do so, he may avoid the sale, and compel the trustee to take back the property sold, and to replace in the trust the price paid for the property, with interest. * * *"

3 Bogert on Trusts and Trustees, Part 1, Sec. 489.

"8. Departmental banks are single corporate entitites, managed by a single board of directors and owned by shareholders who participate in the combined profits and losses of the several departments. Therefore, transactions between separate departments of a bank, affecting a trust for which the bank is trustee, do not create any immunity against self-dealing as between the bank and the trust." **In re Estate of Binder, 137 Oh St 26.**

And see—
**Ulmer v. Fulton, 120 Oh St 323.**

"A corporate trustee violates its duty to the beneficiary if it purchases property for the trust from one of its departments, as where it purchases for the trust securities owned by it in its securities or banking department." Restatement of Trusts, Sec. 170 (i).

The rationale of these principles is well set forth in Scott, Trustee's Duty of Loyalty, 49 Harvard Law Review, 521, at p. 544, et seq., to which reference is made.

With these rules of law, supported by the highest of authority in this state, the members of this court agree. The question for us, however, is not . what the law is in this respect, but whether the facts and the reasonable inferences to be drawn therefrom, support the lower court's ruling that there was no 'self-dealing in violation of these well-grounded principles. We do not approach the issue in an effort to search out mere technical breaches of trust. Our duty is to determine whether there is a substantial breach of legal requirements, as they are to be interpreted in the light of modern business transactions.

A search of the record before us sheds but scant light on these transactions, entered into more than a quarter of a century ago. Death has closed forever the lips of officials,

who, if alive, could tell the story of the investments. Be that as it may, the records show that the purchase of the $16,000 block of bonds was made by the bond department of the bank on "order number 1652" of the estates department, and that the bonds were paid for by the trust and transferred to it on the same day that the bond department paid for and received them. It would seem that these facts indicate a position by the bank antithetic to the idea of any beneficial ownership of the bonds in the bank. They would seem to indicate a business transaction, in which the bond department acted only as a conduit through which the bonds traveled from the brokerage firm to the trust estate for which the bonds were purchased. Likewise, it is reasonable to conclude that the previous purchase of the $10,000 block was made under the same circumstances. They each indicate a method of dealing by the bank in which it, for a few hours, held legal title to the bonds, but which falls far short of showing any beneficial ownership of them in the bank.

In so finding, we feel it the duty of this court to look to the substance of the transaction, rather than merely to its form.

We are of the opinion that the court's ruling on this exception is neither contrary to law nor manifestly against the weight of the evidence.

4. Investments in Common and Preferred Stock of Continental Shares, Inc.

In the year 1929, the trustee invested $25,625 in the preferred stock and $33,446.50 in the common stock of Continental Shares, Inc.

It is contended by the exceptors that (a) Continental Shares stock was speculative and hence not a proper investment for trust funds; (b) it was imprudent to make additional purchases of stock at a time when the Rees trust had already an unduly large proportion (71%) of its holdings in stocks; (c) the purchase of Continental Shares stock constituted an unlawful delegation and surrender of the trustee's investment powers.

As heretofore noted, the trial court found against the exceptors on these charges.

Under the terms of the trust, the trustee was given authority to invest in such stocks as it deemed to be for the best interest of the estate, and "authority to vary or transpose the same into others of like or similar nature, deemed suitable for the investment of trust funds." We construe this part of the will as reflecting the intent of the testator to give the trustee, with the advice and consent of H. Maynard

Rees, a beneficiary, "absolute discretion" to invest in such stocks as they should deem "suitable for the investment of trusts funds." From the language used, the powers of investment given the trustee were enlarged rather than limited in scope.

The granting of this power by the testator may be accounted for by his experience, close association and friendship with bankers and financiers in his home city of Cleveland, and his respect for their judgment in the investment of funds.

We have before us the trial judge's analysis of the evidence relating to the exceptors' claims under (a) and (b) above. His opinion states:

"Exceptors called expert witnesses to testify in support of their contention that the investment in Continental Shares, Inc. was speculative and imprudent. On the other hand, the trustee called expert witnesses in support of its contention that this investment in Continental Shares was proper and not imprudent under the conditions that existed at the time these various purchases were made, pointing out that the common stock was bought as the result of the exercising of warrants or rights.

It is the contention of the exceptors that the investment in Continental Shares was made on the suggestion of the trustee, and that H. Maynard Rees relied on this recommendation in approving the investment.

On the other hand, the trustee contends and attaches great importance to the fact that this investment in Continental Shares, Inc., was approved by H. Maynard Rees; and that the trustee had no power to make any investments unless and until approved by him.

This Court has weighed the evidence and considered the expert testimony offered by both sides. It is satisfied that the trustee did investigate, and weighed the financial history of the company for the three years prior to making this investment, and that it was informed about and took into consideration the character and experience of its board of directors.

In the opinion of this Court too much weight should not be given to the relatively short period of three years that the company had been in existence before the trustee made its investment, because of the prior experience of the management in the field of investment. The Court is impressed by the contention of the trustee that the portfolio of the company was represented by holdings of stock of old established

companies representing the iron, steel, public utilities, rubber, paint, railroad and petroleum industries. The trustee maintains that it took into consideration the fact that no such stock holdings in such industries were then in the portfolio of the trust estate. This investment is not to be judged by after events. Should the trustee be surcharged because it failed to foresee the depression that followed not only in this country, but in the entire world?

This Court, in an unreported decision in the Stafford case (Probate Court No. 184,146), quoted from the Conover case, **10 O. O. 481,** as follows:

'That this country and the whole civilized world was caught in an economic maelstrom of unprecedented dimensions which has either wrecked or seriously affected almost every line of business in the country, and in fact threatened the structure of government itself, is a fact so well known to all that little evidence on this point would suffice to convince the court that the situation was so unusual and the financial and business world was in such a state of confusion that no trustee as a matter of law, should be held responsible for a depreciation in the value of securities, simply because it pursued a "watchful waiting" policy which was the course of action followed by the owners of stock in general throughout the country.'

The Court of Appeals in the Stafford case **(46 Abs 260),** said, on page 268:

'It is a matter of common knowledge, certainly a matter of which the trial court and this Court could take judicial notice, even if it were not clear from the evidence, that overnight fortunes were swept out of existence. * * *'

These investments must be judged by the conditions and circumstances which existed at the time they were made and not as the result of knowledge gained subsequently. All that could be expected of the trustee is that it use the degree of skill that an ordinary prudent person would have used under similar circumstances. Mr. Justice Putnam of the Supreme Judicial Court of Massachusetts in 1830 decided the Harvard College v. Amory case, 26 Mass. 446. His opinion in that case has had and is having far-reaching influence throughout the country. On page 461 of that opinion Judge Putnam states:

'It has been argued, "that the trustees should have invested

in safe and productive stock, at their own and a **sound** discretion, without being governed by the known opinion of the testator. that he was at liberty to speculate, but the trustees were not. If these positions should be granted, the desired inference would not follow. If the testator, for example, had been in the habit of dealing largely in lotteries and games of hazard, it would undoubtedly not have justified the trustees in making such investments, notwithstanding the testator had been the favorite of fortune. But if the testator had invested his funds to remain permanently in any stock, **that circumstance might well be taken into consideration by the trustees when called to exercise their own best skill and discretion.** They might reasonably and properly inquire and consider what their testator would do in circumstances in which they were placed. Would he recommend an investment that should give simple interest on a loan, or in stock that would probably give much more, and yet have the principal sum reasonably safe?'

And, continuing on page 463:

'We are of the opinion that they had a right to select the stock which they did for that purpose, and that they acted in the premises according to their best skill and discretion. And we have not seen any evidence which would satisfy us that under all the circumstances of the case, they did not act with a sound discretion in making the selection and investment.'

And, on page 465 this general statement is made:

'Trustees are justly and uniformly considered favorably, and it is of great importance to bereaved families and orphans, that they should not be held to make good, losses in the depreciation of stocks or the failure of the capital itself, which they held in trust, provided they conduct themselves honestly and discreetly and carefully, according to the existing circumstances, in the discharge of their trusts. **If this were held otherwise, no prudent man would run the hazard of losses which might happen without any neglect or breach of good faith.'**

In **Miller v. Proctor, 20 Oh St 442,** the Court held, in part 1 of the syllabus:

'Where trustees act within the scope of their authority, and exercise such prudence, care, and diligence as men of ordinary prudence, care, and diligence manifest in like matters of

their own, they should not be held accountable for losses happening from their management of the trust funds.'

As was quoted from the Conover case, supra, in this Court's decision in the Stafford case, supra:

'It is true that a general decline in market value of securities prevailed for several years previous to filing the last account, which decline in market values has brought about a tremendous shrinkage in the value of this estate. **The trustee is not liable simply because this shrinkage occurred. The trustee is only liable for the loss to the trust fund when in the exercise of ordinary prudence it could or should have taken the necessary steps to prevent the loss.'**

And, in the Stafford case, supra, the Court of Appeals held:

'The care and diligence required of an executor is that which an ordinarily prudent man is accustomed to use in the conduct of his own affairs. **18 O. Jur., page 227, Sec. 180 et seq.'**

I have always liked the statement of Justice Brewer, referred to as Justice Brown in Trustee's brief, of the United States Supreme Court, in U. S. v. Bell Telephone Co., 167 U. S. 224:

'But a wisdom born after the event is the cheapest of all wisdom. Anybody could have discovered America after 1492.'

A careful consideration of the evidence relative to the purchase of Continental Shares, Inc., preferred and common stock, leads this Court to believe that there has not been a sufficient showing that these investments at the time they were made were speculative or imprudent, or, as expressed in Speight v. Gaunt, 22 Ch. D. 727, 746,

'* * * My view has always been this, that where you have an honest trustee fairly anxious to perform his duty and to do as he thinks best for the estate, you are not to strain the law against him to make him liable for doing that which he has done and which he believes is right in the execution of his duty, without you have a plain case made against him.'

Exceptors contend that it was imprudent to make this investment because of the large percentage of the trust (71%) which was then invested in stocks. In this connection, the evidence discloses that approximately 80% of the testator's estate at the time of his death consisted of stocks. The trustee was justified in attaching weight to this percentage.

In Harvard College v. Amory, supra, the Court had this to say, page 462:

'In the case at bar, the testator was a man of extraordinary forecast and discretion, in regard to the management of his property. His vast accumulation could not be ascribed to accidental causes, but to calculation and reflection. The fact that he had within three or four years invested nearly half his property in manufacturing stock, was entitled to great consideration and respect, and would, without any change of circumstances, have a strong tendency to justify the selection of the manufacturing stock as a part of the trust fund.'

The eidence further discloses that H. Maynard Rees, the advisor, not only urged retention of stocks, but was insistent that stocks be purchased (specifying common stock) on the threat that he would approve no other form of investment. On November 22nd, 1926, H. Maynard Rees wrote the trustee as follows:

'However, I want it understood that I will not approve the reinvestment of the funds so realized in anything but common or bank stock.'

Again, on March 15th, 1927:

'But I will disapprove the reinvestment of the funds so realized in anything but a common stock whether industrial, public utility or bank. I think the committee should know this.'

Under the circumstances this Court is of the opinion that the trustee was not imprudent in making additional stock investments in Continental Shares, Inc."

The members of this Court are of the opinion that the trial court's conclusions on these challenges are neither manifestly against the weight of the evidence nor contrary to law.

.Proceeding now to "(C)" above—that the purchase of Continental Shares stock constituted an unlawful delegation and surrender of the trustee's investment powers—this court does not find the ruling of the trial court to be such as to justify a reversal thereof.

The trial court ruled:

"* * * There seems little doubt that a trustee may delegate certain kinds of powers under certain conditions. Scott on Trusts, paragraphs 171-2, holds:

'It is often loosely said that acts which involve the exercise of discretion must be performed by the trustee personally, and that acts which do not involve the exercise of any discretion may be delegated to others; that discretionary powers must be exercised by the trustee himself, but ministerial powers may be delegated. This is not, however, quite exact. The mere fact that the exercise of a power involves a certain amount of discretion does not necessarily make it improper to delegate it, since almost every act involves the exercise of a certain amount of discretion.'

However, the exceptors maintain that the nature of the business of Continental Shares, Inc., and the extent of the controlling power by the management over the affairs of this company, including the right of such management to buy or sell securities according to their judgment, without consulting the stockholders, is an improper delegation of authority which is in direct violation of the duties of a trustee. Because of the lack of reported cases on this matter, neither side submitted in their exhaustive briefs much law on the subject. It is understandable, in view of the fact that this type of investment is relatively modern in this country.

Exceptors place considerable stress on the case of Marshall v. Frazier, 80 Pac. 2d, 42, and 81 Pac. 2d, 142 (159 Oregon 491). A study of the facts and law surrounding this case indicates that the governing factors for the decision were different from those involved in the instant case.

The decision in Marshall v. Frazier, supra, has been subsequently modified by two statutory changes, the first indicating that under certain conditions trustees of charitable or educational trusts may invest '* * * in any management type of investment, trust, corporate or otherwise, * * *' and the second, 40-1213, broadening the powers of trust companies acting as trustees who have discretionary powers of investment 'in cor-

porate stocks or in such securities other than those herein above mentioned; as the trustee may deem prudent and appropriate.'

Because of the lack of judicial determination on the subject, and the absence of any law on this question in Ohio, the Court has had to look elsewhere and has been benefited by a recent article written by Mayo Shattuck, former President of the Massachusetts Bar Association, author of the Massachusetts Annotations, Restatement of the Law of Trusts, who has been referred to in the briefs of both the exceptors and the trustee. In Volume 25 Boston University Law Review, 1945, page 12, he states:

'When we are speaking of acquiring shares of an investment trust are we describing an **abandonment** of the duties of a trust in any real sense or are we describing a **discharge** of those duties by participation, in the company of other men of prudence in the community, in a reputable management enterprise, the evidence of which participation consists of a readily marketable certificate? Is the trust management in any real or practical sense abandoned? To me it seems that exactly the opposite has taken place. Nor am I alone in this view. Men of prudence, intelligence and discretion are every day acquiring the shares of well seasoned management type investment companies and investment trusts as desiring "securities" * * *.'

Page 13:

'Now, if it is the intention of modern trust law to place the trustee as nearly as possible in the position of the man of prudence, intelligence and discretion who is making permanent disposition of his own capital, why should not the trustee be extended the same privilege which is every day being exercised by the prudent man who is his model? My answer is that the trustee ought to have that privilege; that there is now no sound reason for denying it to him and that the law must therefore be expected to advance in that direction.'

And, in conclusion, on page 20:

'On the interesting point of delegation of investment duties, therefore, we are still awaiting a final answer from our highest courts. The ancient principles of the law have the appearance of speaking against us but it is genuinely doubtful

whether those principles are applicable to our situation and there are indications that the law is moving in the desired direction.'

This Court believes that the arguments of Mr. Shattuck are well founded. These are changing times. The law of necessity must follow these changes. In all cases where a trustee is not restricted to statutory investments, but has the power to invest in stocks, it is the opinion of this Court that the investment by a trustee in stock of an investment company, or in participating shares issued by an investment trust, does not constitute an improper delegation of authority and power by the trustee. This Court is unable to distinguish in this respect between the powers that are exercised as customary functioning by the management of banks, insurance companies, and of any industrial enterprises that have investment portfolios. Clearly, such comparable managements change the investments carried in their portfolios without consulting with stockholders. It is a recognized fact that the trustees have not hesitated to invest in stocks of such other companies herein above referred to, and that where necessary such other stock investments have been approved and the courts have not regarded such other investments as an improper delegation of authority or power.

This Court is therefore of the opinion that the exceptions to the investment in preferred and common stocks of Continental Shares, Inc., are not well taken and are, therefore, overruled."

5. Exceptions to the investment in stock of the Union-Cleveland Corporation.

We have examined the evidence submitted on the exceptors' claims that in this investment (a) the trustee failed to exercise due care, skill and caution in investing in the stock under challenge, for the reason that it was a new and untried enterprise, organized to conduct a highly hazardous business; (b) that it was imprudent to invest additional funds in stock at a time when the Rees trust already had too large a proportion of its holdings in stocks; and (c) that the purchase of said stock constituted an unlawful delegation and surrender of the trustee's investment powers.

It is our conclusion that the trial court's judgment in overruling this exception is neither manifestly against the weight of the evidence nor contrary to law.

6. In the light of the judgment of the trial court on the exceptions heretofore discussed, which this court affirms in

its entirety, the trustee is entitled to reasonable compensation for its services, and the trial court's finding in that respect will be affirmed.

The judgment is affirmed.

STEVENS, J, and HUNSICKER, J, concur.