AUDREY COSDEN ET AL. *v.* MERCANTILE-SAFE
DEPOSIT AND TRUST COMPANY, TRUSTEE ET AL.

[No. 796, September Term, 1977.]

*Decided March 7, 1979.*

520

The cause was argued before MORTON, THOMPSON and COUCH, JJ.

*Peter Parker,* with whom were *Clarke Murphy, Jr., Nicholas G. Penniman, III, Robert C. Prem, Charles H. Palmer, III,* and *Alexander Gordon, IV,* on the brief, for appellant Audrey Cosden. Submitted on briefs by Peter H. Madden, Michael Madden and Christina Madden, other appellants.

*H. Vernon Eney* and *J. Cookman Boyd, Jr.,* with whom were *John W. Scheflen* and *Venable, Baetjer & Howard* on the brief, for appellees.

THOMPSON, J., delivered the opinion of the Court.

We are concerned with whether or not the Mercantile-Safe Deposit and Trust Company, as Trustee under the will of

William R. Hammond, should be surcharged for a breach of trust in selling the grounds upon which Pimlico Race Track is located for an inadequate price. There are also questions concerning the proper allowance and allocation of the Trustee's commissions and of counsel fees. The case was last before this Court in 1975, *Madden v. Mercantile-Safe Deposit and Trust Co.,* 27 Md. App. 17, 339 A. 2d 340 (1975). We there summarized the relevant facts as follows:

> "William R. Hammond became the owner, in 1905, of some 78 acres of land, with improvements, known as Pimlico Race Track, then located in Baltimore County but which, by later annexation, became a part of the City of Baltimore. The entire property was leased to The Maryland Jockey Club of Baltimore City, which conducted horse racing there. Mr. Hammond, then a widower, died in 1909. His will left the Pimlico property and other assets to Safe Deposit and Trust Company of Baltimore, now Mercantile-Safe Deposit and Trust Company,[1] in trust, and provided, with minor exceptions not now material, that the income be paid to his only child, a daughter, Audrey F. Hammond, for her life. The daughter later became Mrs. Audrey Hammond Madden. In his will the testator gave his daughter a power of appointment, and provided that if she did not exercise the power, the principal of the trust would, at her death, go to the persons who would be entitled to it as if he had died intestate.

> _____

> "[1] We shall refer to the trustee throughout as 'Mercantile', although that part of the name was acquired by merger in 1953.

> _____

> "Through successive leases negotiated between them from time to time, the Pimlico property held by Mercantile, enlarged by the later acquisition of certain contiguous parcels, was continuously leased to the Jockey Club, until August 1947. Under an agreement of sale dated 30 April 1947, the Trustee

sold the Pimlico property which it held to the Jockey Club for $1,115,000. Settlement of that sale in August 1947 terminated the lease which, by its terms, would have ended in 1949.

"Mrs. Madden, in 1943, irrevocably released the power of appointment she had under her father's will. The legal effect of that release was determined by the Court of Appeals in *Madden v. Mercantile-Safe Deposit and Trust Co.,* 262 Md. 406, 278 A. 2d 55 (1971). Her release of the power of appointment, thus rendering impossible a divestiture of the remainder, which she could have accomplished by an exercise of the power, did not, as she contended, merge the remainder with her life estate, on the ground that she was the sole person who would have been entitled to take if Mr. Hammond had died intestate. On the contrary, said the Court of Appeals, the class of persons entitled to the remainder was to be determined at the time of Mrs. Madden's death, and would be those persons who then would have been entitled, according to the law in effect in 1909, to take Mr. Hammond's estate had he died intestate.

"To continue this narrative, we quote from the opinion in *Madden v. Cosden,* 271 Md. 118, 314 A. 2d 128 (1974), an earlier appeal from an order entered in the present case, where the Court of Appeals said, at 119-20:

'Mrs. Madden died on 4 January 1972, survived by three daughters, Audrey Cosden, Anne M. Hallenbeck, and Jane M. Humphreys, each of whom have descendents, and by three grandchildren, Peter H. Madden, Michael J. Madden and Christina Little Madden, the children of Mrs. Madden's only son, James H. Madden, who had died in 1953.

'Immediately following Mrs. Madden's death, Mercantile-Safe Deposit and Trust

Company (the Mercantile), trustee of the trust estate created by Mr. Hammond's will, caused to be prepared a schedule of the assets then comprising the trust, which had a value of some $3,000,000.00, and of a proposed distribution, under which Mrs. Cosden, Mrs. Hallenbeck and Mrs. Humphreys, daughters of Mrs. Madden and granddaughters of Mr. Hammond, would each receive one-fourth of the trust assets, and Peter H. Madden, Michael J. Madden and Christina Little Madden, grandchildren of Mrs. Madden and great-grandchildren of Mr. Hammond, would each receive one-twelfth of the trust assets, since they shared equally the one-fourth share which would have passed to their father, if living.

'When it became apparent that all of the children of James H. Madden were not willing to acquiesce in the proposed distribution, the Mercantile in June, 1972, filed in the Circuit Court of Baltimore City a bill of complaint which recited the circumstances; asked that the court assume jurisdiction of the trust, and determine the proper distribution of the trust estate.

* * *

"The issue presented and decided in *Madden v. Cosden, supra,* was the validity of Mrs. Madden's second marriage, following a Nevada divorce, and whether Mrs. Hallenbeck and Mrs. Humphreys, children of that second marriage, were entitled, as lawful heirs and next of kin of Mr. Hammond, to share in the distribution. The Court of Appeals held that they were.

"The Present Case in the Circuit Court

"Mercantile's bill of complaint to determine the

proper distribution of the trust was filed in the Circuit Court of Baltimore City on 23 June 1972. Combined answers, cross-claims, and counterclaims filed by Peter H. Madden on 21 August and 23 August were later stricken, apparently for reasons of form, and on 26 December 1972, with leave of court, he filed an amended counterclaim, naming as counter-defendants Mercantile, in its trust capacity and in its individual capacity, and, as an added party, the Jockey Club. Leave to bring in the Jockey Club as a counter-defendant was later granted. At the same time he filed his answer to Mercantile's complaint Peter H. Madden filed the cross-claim against his codefendants which raised the issue decided in *Madden v. Cosden, supra.*

"On 10 April 1973, with leave of court, Peter H. Madden filed a second amended counterclaim, in which Audrey Cosden joined. On 17 May 1973, with leave of court, a third amended counterclaim, in which Michael Madden and Christina Madden also joined as counter-complainants, was filed.

"The Counterclaim alleged that in selling the Pimlico Race Track to the Jockey Club in 1947, Mercantile had breached its .fiduciary duty in numerous ways, resulting in the disposition of a trust asset for an inadequate price. It sought to surcharge Mercantile for the difference between the sale price and the actual value, or, in the alternative, to rescind the sale." 27 Md. App. at 20-24.

At the close of appellants' case on the surcharge counterclaim the chancellor granted Mercantile's motion to dismiss under Rule 535. In reversing that ruling we pointed out that such a motion tests the legal sufficiency of the evidence. We then discussed the evidence adduced by the appellants on each of their theories of breach of trust. We said:

"In the case before us the contentions of the appellants cover the full range of breach of fiduciary

duty, from bad faith and self dealing, to precipitous action, lacking the required diligence, and taken by the exercise of poor and uninformed judgment and without exploiting potential offers to buy at a higher price.

\* \* \*

"We lay aside 'self dealing' in the strict sense. Appellants misuse the term, we think, in characterizing Mercantile's actions. When a person, natural or corporate, is a party to or otherwise profits from a transaction with a trust or other estate of which he is a fiduciary, as when he buys from or sells to the trust, or acts as a broker in the sale, he is self dealing. The courts generally hold that such a transaction, in the absence of full disclosure and consent of all beneficiaries, is voidable by the beneficiaries, with no need to show unfairness. *McDaniel v. Hughes,* 206 Md. 206, 111 A. 2d 204 (1955); *Schockett v. Tublin,* 170 Md. 117, 183 A. 521 (1936); *Mangels v. Tippett,* 167 Md. 290, 173 A. 191 (1934).

"Mercantile did not buy the Pimlico Race Track property from the Hammond Trust, nor otherwise profit from the sale, except for its commissions as trustee. The sale did not involve any self dealing.

"Appellants point to evidence that several members of the Board of Directors of Mercantile had other connections which, appellants contend, showed or raised a presumption that each was subject to conflicting interest which destroyed or impaired his ability to act in the best interest of the Hammond Trust.

"Charles E. Rieman was the president of Western National Bank, which was the Jockey Club's principal depository, and which at times made substantial loans to the Jockey Club.

"F. Granger Marburg was a partner in the brokerage firm of Alex. Brown & Sons, and as such

was a partner of W. Wallace Lanahan. Mr. Lanahan was a member of the board and executive committee of the Jockey Club, and was one of the Jockey Club's two negotiators for the purchase of the Pimlico Race Track. There was also evidence to indicate that Alex. Brown & Sons owned 350 shares of stock of the Jockey Club, but there was further evidence that the stock had been acquired for Alfred Gwynn Vanderbilt and had been transferred to him.

"Edwin F. A. Morgan was a partner in the law firm of Semmes, Bowen and Semmes, and as such was a partner of Lawrence Perin, and shared with him in the fees received by the law firm for its representation of the Jockey Club. Mr. Perin was a member of the board and executive committee of the Jockey Club, and was the Jockey Club's other negotiator for the purchase of the Pimlico Race Track.

"J. Edward Johnston personally owned 100 shares of stock of the Jockey Club.

"Messrs. Rieman, Marburg, Morgan, and Johnston were members of Mercantile's board of directors. Messrs. Rieman and Johnston were members and Messrs. Marburg and Morgan were associate members of the executive and of the trust investment committees.

"There was evidence that Mercantile held, in various trusts or in agency accounts, some 950 shares of stock of the Jockey Club. Mr. Vanderbilt owned a majority of the Jockey Club's 4,540 outstanding shares.

"The evidence showed that in 1946 a question which had become of significant importance was the adequacy of the physical facilities at Pimlico, and the feasibility of improving them, or of moving to a different location. The then current lease would have expired in 1949. The Jockey Club suggested that it would purchase the property from Mercantile, and suggested a price of $700,000.00. Mercantile

informed Mrs. Madden, the life beneficiary, who was then thought by some to be the sole party in interest, because of her renunciation of the power of appointment in her father's will. Her personal attorney was also kept informed. She declined to consider the offer of $700,000.00.

"Later in 1946 Mercantile arranged to have a Mr. Gilbert, a well known real estate appraiser in Baltimore, appraise the land. He valued it at $540,000.00. A Philadelphia engineering firm, suggested by Mrs. Madden's attorney, made a study primarily to determine what it would cost the Jockey Club to relocate its racing operation, and to duplicate Pimlico's physical facilities at a new location. One of the conclusions of that study was that the improvements at Pimlico could be reproduced new at a cost of approximately $1,600,000.00, and that their current depreciated value was $1,000,000.00. Mercantile noted that the value of the Pimlico property, at least by one approach, was indicated to be $1,540,000.00.

"Mercantile also approached the question of value in other ways. It made studies by capitalizing rents, adjusted for what it considered to be valid factors, using several different assumed rates of return. Possible values ranged up to a figure in excess of $2,000,000.00. There was other evidence at the trial indicating even higher values. Mercantile concluded that $1,500,000.00 was a reasonable value. It put that figure to the Jockey Club as an asking price.

"Other factors affecting value which were shown by the evidence were that the Jockey Club, not the trust, owned the names of several well known stakes races run at Pimlico, most famous of which was the Preakness. The Jockey Club, not the trust, was the licensee for conducting horse racing at Pimlico. State laws then in effect froze major racing at mile tracks in Maryland at the existing four locations, so that

each party was, in many ways, compelled to deal only with the other.

"The General Assembly session of 1947 saw indications of change. A bill was introduced which would authorize any of the four major licensees to conduct racing at a different location, but which would still limit the number of licensees to four. The parties met as adversaries in the lobbies and halls of the State House. Intensive lobbying activities were conducted on behalf of each. As the session was nearing its end, the lobbyists for Mercantile were successful in bringing about an amendment [the Miles Amendment] to the bill which would permit a licensee to relocate, but would then permit racing at five locations. The amendment was passed by the Senate on second reading by a vote of 15 to 13.

"It was clear that if that amendment became a part of the law, the owner of Pimlico Race Track would have to deal with a tenant which had alternatives. The Jockey Club could stay, under a new lease, or it could relocate. If it relocated, the trust would be required to seek another operator, one which could obtain a license, and which could then conduct horse racing at Pimlico. Pimlico would then be one of five, rather than four, major tracks in Maryland. If the amendment failed of final passage, the owner of Pimlico would have little more than a piece of real estate, appraised at slightly over one half of a million dollars.

"Before the Senate Bill came up for third reading, a memorandum of agreement was reached by negotiators for the Jockey Club and Mercantile. The Jockey Club would buy the property for $1,115,000.00.

"There was evidence that Mercantile did little or nothing to find or interest other possible purchasers. There was evidence that it did little or nothing to exploit indications of interest from other sources.
* * *

"[T]here was evidence at the trial which, viewed most favorably to the counter-complainants, coupled with reasonable inferences from the evidence, could have permitted a trier of fact to find the fair value of the asset sold to be within a wide range of indicated values. There was evidence from which a trier of fact could find that Mercantile used due diligence and exercised good judgment under all the circumstances, but the evidence would likewise permit finding that Mercantile failed to use the required diligence and good judgment in selling the trust asset. There was evidence of potential for conflicts of interest, from which a trier of fact might infer that conflicts did, or might infer that they did not, result in a less than adequate price by affecting the quality of diligence and judgment with which the sale was made.

\* \* \*

"*In short, the critical decision in this case was for the trier of the facts,* and could not be resolved on the basis of sufficiency as a matter of law. We hold that the chancellor erred in granting Mercantile's motion to dismiss." (Emphasis added.) 27 Md. App. at 32-36, 40-41.

After remand for further proceedings, the chancellor permitted the counter-complainants to reopen their case on a restricted basis as follows:

"[T]he petition of the counter-complainant, Peter Madden, to proffer newly-discovered evidence and the petition of the other counter-complainants to reopen their case in chief for the purpose of the introduction of additional evidence is granted, i.e. the counter-complainants shall be permitted to reopen their case in chief at the resumption of trial for the purpose of offering the following into evidence: One, evidence with respect to valuation of Pimlico Racetrack, including without limitation, expert testimony and documentary evidence. Two, evidence

of — strike that — evidence bearing on the issue of laches in bringing the within action. Three, evidence relating to the release of the power of appointment by the life tenant of the trust. Four, further testimony from Mr. Frederick and Mr. Opie, and five, evidence as to the identification of the true or real owners of the stock of the Maryland Jockey Club, held by Mercantile-Safe Deposit and Trust Company or its then predecessor, in the name or names of a nominee or nominees.

"This ruling in no manner relates to the admissibility into evidence of any items covered in the foregoing categorical descriptions, but bears only on the right of the counter-complainants to reopen their case in chief for the purpose of offering evidence within those categories.

"Except to the extent provided expressly by the foregoing ruling, the counter-complainants may not reopen their case in chief."

After both sides had introduced such evidence as they desired, the trial judge found that Mercantile used due diligence and exercised good judgment under all the circumstances and that the alleged conflicts of interest did not result in Mercantile obtaining a less than adequate price for the property. As we indicated in our prior opinion, there was already in the record sufficient evidence to support these findings. Nothing produced on retrial has altered this situation. Therefore, we are required under Md. Rule 1086 to affirm. In ordinary circumstances we would terminate this portion of our opinion at this point. In view of the extraordinary expense and effort devoted by the parties to these proceedings, we will discuss the appellants' specific arguments briefly.

### Breach of Trust

In our prior opinion the major question before us was whether the appellants had adduced sufficient evidence to

survive a motion to dismiss under Md. Rule 535. Such a motion tests the legal sufficiency of the evidence and requires that it be viewed in the light most favorable to the non-moving party. In the present appeal, we are called upon to review the chancellor's findings of fact and his application of the law to those findings. The scope of our review is now governed by Maryland Rule 1086 which requires that we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the prevailing party and that we affirm the decree unless we find the chancellor's factual conclusions clearly erroneous or that he misapplied the law. If there was substantial evidence presented which supports the chancellor's findings they must be affirmed. *Delmarva Drill Co., Inc. v. Tuckahoe Shopping Center, Inc.,* 268 Md. 417, 302 A. 2d 37 (1973); *Moon v. Weeks,* 25 Md. App. 322, 333 A. 2d 635 (1975).

Appellants' major contention is that the Trustee, Mercantile, breached its duty to the Hammond Trust in the sale of Pimlico because it acted with divided loyalty, in that it held in other fiduciary accounts a significant portion of the Jockey Club's stock; because certain of its directors had interests conflicting with those of the trust; and because it failed to exercise the diligence and prudence required of it in marketing the racetrack. Through all of these allegations there runs a common thread: the question of the adequacy of the sale price. Each of appellants' theories of breach of trust depends on whether the sale price was fair and adequate. Therefore, for the sake of convenience, we will discuss that aspect of the case first.

Much has been said in the briefs concerning the burden of proof relative to the fairness of the purchase price. In our view, the appellee has met the most stringent burden which the law applicable to this case has placed upon it. *Harlan v. Lee,* 174 Md. 579, 199 A. 862 (1938) provides us with the standard applicable where it appears that a fiduciary may have acted out of divided loyalty. In that case a single individual served both as executor of an estate and as trustee of one-third of the estate for the benefit of one of its three distributees. At a public sale, an undisclosed agent of the

executor, acting for him in his capacity as trustee, purchased certain ground rents owned by the estate. Thus, the executor-trustee, acting in a dual fiduciary capacity, both sold and purchased the property. An objection to the validity of the sale was raised by those entitled to that share of the estate not subject to the trust. The Court held that where the dual fiduciary was acting as a trustee, and not for his own account, the mere fact that he was both the seller and the purchaser of the property would not, of itself, invalidate the sale. The Court went on to point out that because there was also a claim that the asset was sold for an inadequate price, "the objection to the sale would be sustained if the executor failed to establish by a clear preponderance of testimony that the sales of the ground rents were fairly made, in good faith and for an adequate price." 174 Md. at 594.

Although the potential for conflicting loyalties in the present case is not as obvious and direct as it was in *Harlan,* we nevertheless conclude that such potential did exist and therefore we will apply the same burden of proof.[1] Thus, the relevant question, so far as proving the adequacy of the price is concerned, is whether it was shown "by a clear preponderance of the testimony that the [sale was] fairly made ... and for an adequate price."

The evidence showed that in an attempt to ascertain the value of the land and improvements owned by the Hammond Trust at Pimlico, Mercantile obtained an appraisal of the land from one Harry E. Gilbert, a qualified real estate appraiser, and an estimate from the engineering firm of Day and Zimmermann of what it would cost to reproduce the improvements and various facilities then existing on the Pimlico property. Day and Zimmermann included a

---

1. We hasten to point out that the transaction involved in the present case was perhaps less prone to have suffered from the effects of divided loyalty than was that described in Harlan, *supra.* In Harlan a single fiduciary (through an agent) acted as both purchaser and seller. In the instant case the evidence shows that the trustee participated in the sale of the Pimlico property only as the seller. The interests of the purchaser were represented by its officers. Mercantile purchased nothing for the accounts holding the Jockey Club stock. The purchase was made by the Jockey Club and any resulting benefit to those accounts would have been indirect and fragmentary.

computation of the cost of replacing the Pimlico improvements less depreciation. The Gilbert appraisal together with the latter figure from Day and Zimmermann yielded an estimated value of land and improvements of $1,540,000.00. These reports were competent evidence of the fair market value of the Pimlico property and improvements owned by the Hammond Trust at the time of the sale. Appellants have attacked the reliability of the reports but their arguments go only to the weight to be given to the evidence. The chancellor was well within his discretion in relying on the figures compiled by Gilbert and Day and Zimmermann.

Evidence of value also included the testimony of Mr. Philip E. Klein, a qualified expert in the appraisal of real estate. Mr. Klein stated that in this opinion the 1947 value of the land and improvements at Pimlico, assuming its continued use as a racetrack, was $1,532,000.00. He further stated that the value of the property at its highest and best use other than for racetrack purposes was $532,000.00. Again, appellants attack Mr. Klein's testimony with arguments that go to its weight; but this was a matter for the chancellor to determine and we see no reason to conclude that he was erroneous in accepting, as he did, the testimony of Mr. Klein.

We come now to what is perhaps the most crucial consideration bearing on the value of the property sold. The evidence shows that in 1947 the Maryland Jockey Club was seriously considering moving its operations to a new location. A measure then pending in the legislature, Senate Bill 101, would have permitted such a move and very likely would have left Pimlico unavailable as a racetrack. The result would have been a substantial reduction in the value of the property, and the imminence of this threat would have had an injurious effect on the value of the property. The trustee fought the passage of Senate Bill 101 quite aggressively through the services of a highly regarded lobbyist hired for that specific purpose. An amendment [Miles Amendment] to the Bill, which would have permitted racing to continue at Pimlico if the Jockey Club had moved, was adopted on its second reading in the Senate by a margin of one vote. The war in the

legislature was not won, however, with the tentative adoption of the compromise amendment. The evidence was quite clear that opposition to the amendment was still strong and that numerable opportunities still existed for the adoption of Senate Bill 101 as originally proposed. It was under the threat of this legislation that Mercantile sold the property to the Jockey Club for $1,115,000.00.

In making their arguments, appellants completely downgrade the legislative situation and its effect on value. They overlook that the amendment had been adopted by one vote in the Senate and could easily have been removed before the legislature adjourned; in which event the Pimlico real estate would have been worth, according to one appraisal, only slightly more than half a million dollars. As pointed out in our prior opinion, even with the amendment the Jockey Club had the alternative to relocate and if it did so Mercantile would have been required to seek another operator who could obtain a license and conduct horse racing at Pimlico. In addition, Pimlico then would have been one of five, rather than four, major tracks in Maryland. In ignoring this situation, the appellants, and indeed their witnesses below, tend to grossly overvalue the assets which were sold.

We reject appellants' argument that in the valuation of land and improvements the chancellor failed to consider all elements of value owned by the Hammond Trust with respect to Pimlico. On the evidence presented, we have no basis to conclude that the chancellor committed error in excluding the various elements of value which appellants suggest were a part of the Hammond Trust assets. With respect to the alleged "good will" of the location and name of Pimlico, the chancellor remarked as follows:

"Going now to some of the principal facts bearing on value, the evidence shows Pimlico had an excellent location. It shows that Pimlico was steeped in tradition, *but the imponderable question is how much of that tradition attached to the site or the name of the site and how much attached to the Maryland Jockey Club and the Preakness.* The

evidence also shows that Pimlico's improvements were very old and, although well-maintained, they were obsolescent and well below standard for a modern racetrack operation in the post-World War II era." (Emphasis added.)

On the evidence, the chancellor was not clearly wrong in concluding that this question was indeed "imponderable" and, accordingly, he was correct in excluding it from his determination of value.

Appellants' attempts at valuation consisted in the main of capitalizing the income earned over a number of years by the Maryland Jockey Club. Alternatively, they also capitalized rents paid by the Jockey Club to the Trust over a similar period. The chancellor was not required to rely on this method of valuation. See *Brinsfield v. Mayor and City Council of Baltimore*, 236 Md. 66, 202 A. 2d 335 (1964); *State Roads Commission v. Novosel*, 203 Md. 619, 102 A. 2d 563 (1954). The fact that the trustee was not selling a horse racing business as a going concern but simply the land and improvements where it was conducted was sufficient justification for the chancellor's decision to prefer Mercantile's approach over that of the appellants. It should be noted here also that the major part of the yearly rent was a percentage of gross earnings. Capitalization of the earnings of a business conducted upon land may reflect the efficiency of management and other aspects of the business operation rather than the value of the land itself. Accordingly, it is not always the most reliable method of valuation. In this case particularly there was evidence to indicate that the profitability of the business conducted by the Jockey Club was due to its tradition, management and assets rather than anything which the property owned by the trust may have contributed. There was also evidence that the years over which earnings were capitalized by appellants' expert were atypical and there was a serious question whether any racetrack business would continue on the site.

Appellants also attempted to prove value through reference to 1947 tax assessments and insurance valuations.

Both of these figures were of doubtful worth in proving the market value of the property. As the chancellor noted, "they are at best hearsay opinions, and in this case we are not even certain, to some extent, whose opinions they are."

In view of the above discussion, which only summarizes the voluminous evidence contained in this record concerning value, we cannot say that the chancellor committed error in concluding that "the evidence is clear and convincing that the price was adequate."

Having established the validity of the chancellor's finding that the sale price was adequate, we now move to a discussion of the specific theories of breach of trust advanced by the appellants.

It is argued first that Mercantile owed a duty of complete loyalty to the Hammond Trust and that such duty was breached when the Trustee sold trust assets to a corporation in which it held approximately a 20% interest in other trust or fiduciary accounts. We note at the outset, as we did in our prior opinion, that this circumstance does not create a case of "self dealing" in the strict sense. The trustee did not deal with itself for its own advantage or profit from the transaction. Accordingly, we find the strict principles applied in self dealing cases are not applicable here. Appellant Cosden argues that because of this relationship, and because of the various direct and indirect relationships between directors of Mercantile and the Jockey Club in 1947, which we discuss below, the Trustee was required to prove not only the fairness of the sale but also that all the beneficiaries of the Hammond Trust were fully informed of all the facts concerning the property and the transaction and freely consented thereto. The case relied on for this proposition is *McDaniel v. Hughes,* 206 Md. 206, 111 A. 2d 204 (1955), which, of course, is a self dealing case and, therefore, not applicable here.

The rule applicable to this situation is the more flexible standard used in viewing transactions between trusts with a common trustee. It is the same standard discussed in *Harlan v. Lee, supra;* that is, where a common fiduciary deals for and between two different trusts or fiduciary accounts the transaction will be sustained if it is shown to have been fairly

made, in good faith and for an adequate price. This view is in accordance with that generally accepted by most authorities. *See French v. Hall*, 198 Mass. 147, 84 N. E. 438 (1908); *In re Binder's Estate*, 137 Ohio St. 26, 27 N.E.2d 939 (1940); *In re Rees' Estate*, 53 Ohio Abs. 385, 85 N.E.2d 563 (1949); *In re Saeger's Estate*, 340 Pa. 73, 16 A. 2d 19 (1940); *Restatement* (Second) *Trusts,* § 170, comment r (1959); II Scott, *Trusts* (3d. ed. 1967) § 170.16; Prochnow, "Conflict of Interest and the Corporate Trustee," 22 Bus. Law. 929 (1967); Comment, "Corporate Trustees Conflict of Interest," 25 U.Chi.L.Rev. 382 (1958). The practical advantage of this approach is that it avoids imposing undue restrictions on business trustees which may handle a large number of trust accounts. There may be circumstances in which it is to the best advantage of two trusts to deal with each other even though they are administered by a common trustee. The instant case is a particularly good example of such a situation. The dangers of divided loyalty are sufficiently guarded against by imposing the burden on the trustee to prove that the transaction was made in good faith and for an adequate price as required by *Harlan v. Lee, supra.*

We have already expressed our view on the price issue. The evidence likewise supports the conclusion that the sale was made in good faith.

The record shows that the negotiations between the trustees and the Jockey Club, for the sale of the Pimlico property, were not merely at arms length but were indeed vigorously and hotly contested by both sides. It was the Jockey Club which approached the Trustee; first in 1938 with an offer to purchase Pimlico for $800,000, and then in 1946 with an offer to purchase for $700,000. Both of these offers were rejected. After the second offer, negotiations continued and became progressively more serious. Mercantile employed Gilbert and Day and Zimmermann not only to determine the value of the assets in question but also the costs to the Jockey Club of relocating. This latter piece of information was used as a bargaining tool to demonstrate to the Jockey Club the advantage of remaining at Pimlico.

Mr. Henry A. Parr, III, an officer and director of the Jockey

Club at the time in question, testified through deposition that the negotiations over the sale of Pimlico were hard fought on both sides. Mr. Lawrence Perin, who in 1947 was also a director of the Jockey Club and its chief attorney, testified at the trial that the position of Mercantile's president and chief Pimlico negotiator, Mr. Thomas B. Butler, was "adamant" and "hard boiled" with respect to the sale. Perin also testified that at the time he felt Mercantile was demanding too high a price for the property. We note further that the legislative situation described above also tends to support the wisdom and *bona fides* of the sale; especially when one considers the Trustee's efforts to fend off the threat posed by Senate Bill 101.

These references to the evidence are but a slight sketch of the mass of data contained in the record tending to show the fairness and good faith of the transaction. There is substantial support for the chancellor's findings that "the evidence . . . is clear and convincing that no conflicts, potential or otherwise, had any effect on the sale of the Pimlico land and improvements owned by the trustee . . .", and that, "there was no bad faith or disloyalty to the trust on the part of any employee, officer or director of the trustee."

Appellants next argue that the various direct and indirect relationships between certain of Mercantile's directors and the Jockey Club also created a conflict of interest affecting the adequacy of the purchase price and the good faith of the transaction. We have already pointed out that the chancellor was correct in concluding that the purchase price was adequate and we are likewise persuaded that he was correct in concluding that the subject relationships had no effect on the transaction. His findings on this aspect of the case were as follows:

> "The evidence again is clear and convincing that no conflicts, potential or otherwise, had any effect on the sale of the Pimlico land and improvements owned by the Trustee.
>
> * * *

"The direct testimony, none of which I found suspect, is that none of these relationships in any way was a factor in the negotiations or in the ultimate sale. It is clear from the evidence that *none of these directors* [Marburg, Rieman, Morgan, Johnston] *in any way participated in the negotiations or in the sale, or even in a formal approval of the transaction, at any stage.* . . . The actual decision was obviously made by the executive officers of the corporation without consultation with the Board of Directors." (Emphasis added.)

In light of these findings, which were amply supported by the evidence, and in light of our holding that the transaction was fairly made, in good faith and for an adequate price, we conclude that the bare relationships and the remote potential for conflicts shown by appellants, do not justify surcharging the trustee. *See Hammond v. Lyon Realty Co.,* 163 Md. 442, 163 A. 480 (1932); *Cumberland Coal and Iron Co. v. Parish,* 42 Md. 598 (1875); *Madden v. Mercantile-Safe Deposit and Trust Co.,* 27 Md. App. 17, 36-40, 339 A. 2d 340 (1975); *Burlingham v. Worcester,* 351 Mass. 198, 218 N.E.2d 123 (1966); *Loud v. St. Louis Union Trust Co.,* 313 Mo. 552, 281 S. W. 744 (1926); II Scott, *supra,* § 170.10.

The appellants next argue that Mercantile did not make sufficient effort to market the property or to ascertain its true value and, as a result, failed to ask and obtain a sufficient price. Our conclusion that the price received was shown by the evidence to have been fair and adequate under the circumstances of this case is sufficient to dispose of this contention. We shall discuss the other aspects of this point in order to demonstrate that the chancellor was also justified in concluding that there was no lack of due diligence in valuing or marketing the property sold.

The legal principles applicable to a contention such as this have been stated in several opinions of the Court of Appeals and were most recently summarized by us in our prior opinion in this case. Once again we will set them out briefly.

A trustee undertaking to sell the property of a trust has

the duty to secure the fair market value of the property and to employ that degree of care, skill and judgment which a reasonably prudent man would exercise in the conduct of a similar sale. A conventional trustee is vested with a certain amount of discretion in making such a sale. "If a sale should be made by a conventional trustee in good faith and according to his best judgment, the sale will not be set aside unless there exists an inadequacy of price that, under the circumstances, is directly attributable to some failure of reasonable diligence or effort in the making of the sale." *Kramme v. Mewshaw,* 147 Md. 535, 548, 128 A. 468 (1925). Factors which will be considered in determining whether the Trustee exercised the requisite degree of diligence and care include its efforts to determine the value of the property sold, its method of offering the property and whether it closed the sale without endeavoring to obtain better bids. *Webb & Knapp, Inc. v. Hanover Bank,* 214 Md. 230, 133 A. 2d 450 (1957). Where insufficient efforts have been made to ascertain the adequacy of the sale price a trustee's good faith in carrying out the transaction may not be sufficient to sustain its validity. *See Webb & Knapp v. Hanover Bank, supra; Knight v. Nottingham Farms, Inc.,* 207 Md. 65, 113 A. 2d 382 (1955). The trustee need not, under all circumstances, seek the counsel and aid of real estate agents or advertise the property before its sale. *Kramme v. Mewshaw, supra.* As in the general management of trust assets, the trustee must exercise the care that an ordinarily careful man in his situation would exercise about his own affairs; but he may not "adventure the trust assets as a business man might properly adventure his own." *Zimmerman v. Coblentz,* 170 Md. 468, 484, 185 A. 342 (1936).

The facts to which these general principles are to be applied in the present case were ably summarized by the chancellor:

> "Use of these experts — that is, Day and Zimmermann and Gilbert — to establish what was essentially a summation value or cost of reproduction new less depreciation, and as a guide to establishing the asking price for the property, cannot be faulted. Mr. Klein's opinion as to the value

of the real property as improved and for use as a racetrack corroborates the soundness of the Trustee's valuation approach. There is no evidence of truly comparable sales to which the Trustee could have referred or to which we have been or could be referred. Constant reference to the sale of a little more than half of the stock in the Eastern Racing Association is not very helpful because that was not a sale of real property. There is no way, based on the evidence we have here, that one can utilize that sale as a comparable sale of racetrack real property. The same is probably true with respect to the sale of the Laurel stock. . . .

"Going now to some of the principal facts bearing on value, the evidence shows Pimlico had an excellent location. It shows that Pimlico was steeped in tradition, but the imponderable question is how much of that tradition attached to the site or the name of the site and how much attached to the Maryland Jockey Club and the Preakness. The evidence also shows that Pimlico's improvements were very old and, although well-maintained, they were obsolescent and well below standard for a modern racetrack operation in the post-World War II era.

"There was in 1946 and 1947 a very real possibility that Pimlico would move to another site and would be permitted to do so. The Maryland Jockey Club was seriously considering moving and, in spite of Mr. Mahoney's [2] testimony, in view of the public statements which had been made by the Maryland Racing Commission, no one could safely conclude at that time that the Maryland Racing Commission would block a move by the Maryland Jockey Club. Senate Bill 101, Section 7, as introduced in the 1947 Legislature, was intended and was understood by all as intended to permit the Maryland Jockey Club to

---

2. This is a reference to Mr. George P. Mahoney who from 1944 to 1947 was Chairman of the Maryland Racing Commission.

move. No one in 1947 thought otherwise. It is also clear that the intention was understood to be that if the Jockey Club did move, Pimlico would no longer be available for use as a racetrack.

*"In view of these facts, the course of conduct undertaken by the Trustee in late 1946 and 1947 was not only proper, it was essential. Sound judgment was exercised. The Trustee was not only diligent; the Trustee was aggressive both in the Legislature and in its negotiations with the Maryland Jockey Club. The sales price finally arrived at was the result of hard-fought, arm's length negotiations in which the Trustee was seeking the highest price obtainable and the Maryland Jockey Club, on the other side, was seeking the lowest possible price.* The fact that the Trustee did not wring the last one hundred eighty-five thousand dollars of authority out of the Jockey Club negotiators in no way reflects adversely on the bona fides of the transaction, or the diligence of the Trustee, nor on the adequacy of the price.

"In addition to what has already been mentioned, there are reasons why the Trustee was, if not forced, at least well-advised to deal at least primarily, if not exclusively, with the Maryland Jockey Club. The Maryland Jockey Club not only held the license for racing at Pimlico, but had always held that license. The Trustee had neither a dead track to sell to someone interested in going into the racetrack business, nor did it hold a going concern which it could offer to one who wanted to buy a racetrack business. It held a racetrack which was under lease to the Maryland Jockey Club, who had the only available license to use that property for that purpose. Tangentially, there is no evidence in this case from which the Court could find or indeed indicating that the lease then extant was in any way an improvident lease.

"The conduct of the Maryland Racing Commission and the Legislature, at least prior to the Miles

amendment of Section 7 of Senate Bill 101, clearly indicated that the Maryland Jockey Club held one of the only four licenses and was, stating it another way, one of the only four licensees for the operation of one mile tracks in Maryland. It seems clear that if the Maryland Jockey Club and Pimlico had parted company, the license would have gone with the Maryland Jockey Club and not to the successor in possession of Pimlico. Before the Miles amendment, no sane person could consider paying a racetrack price for Pimlico without being certain that he could get a license to operate it as a racetrack. Under these circumstances, there would appear to have been nothing which could have been gained from advertising a racetrack for sale or placing it with a broker for sale. In any event, the evidence shows that advertising was unnecessary. Similarly, it is understandable why the inquiries received by the Trustee turned out, as the testimony tells us, in most instances to be just that — inquiries. The evidence shows no lack of diligence in pursuing these inquiries. The evidence is that they were followed up.

\* \* \*

"When the Miles amendment to Section 7 of Senate Bill 101 passed, it cannot be disputed that the Trustee had won a major battle. At the same time, it cannot be disputed that the war was far from over. The Trustee could not safely take respite until the adjournment of that session of the Legislature, and that victory did not mean that the subsequent truce was a bad bargain for the Trustee. Anyone who has a rudimentary knowledge of the legislative process knows that until the bill is finally passed and sent to the Governor you don't know what is going to be in it, and until the legislative session ends you have no way of knowing what action is going to be taken with respect to any pending bills. *For the Trustee to have gone home from that session and rested on its laurels would have been to invite disaster. Even to*

*have continued the battle vigorously with the hope of ultimate success does not seem to be a course of action that was prudent.* Even under the Miles amendment, there are many questions as to what the value of the Pimlico Racetrack property, to the extent it was held by the Trustee, would be."
(Emphasis added.)

We shall not catalog the voluminous evidence upon which these findings were based, but deem it sufficient to state that we find them amply supported by the record. Application of the relevant legal principles to the facts just quoted supports the chancellor's conclusion that there was no lack of diligence in ascertaining the value of the property or in obtaining the best price then available.[3] The Trustee had all the evidence of value before it which it needed to make a reliable estimate of the worth of the Pimlico property. We cannot say that it failed to exercise the degree of care required of it and by no means are we prepared to state that the chancellor was clearly wrong in so concluding. We have already concluded that the evidence supports the finding that the Trustee, through its officers, acted at all times in good faith and that the price received was fair and adequate.

We have addressed all of the appellants' contentions on the breach of trust issue which we will need to discuss and, as indicated, we find them without merit. We do not reach and do not decide any new questions that may have been raised in the reply briefs. Md. Rule 1031 c 5; *Hyde v. State,* 228 Md. 209, 218, 179 A. 2d 421 (1962), *cert. denied,* 372 U. S. 945, 83 S. Ct. 938, 9 L.Ed.2d 970 (1963); *Jacober v. High Hill Realty, Inc.,* 22 Md. App. 115, 321 A. 2d 838 (1974). Any other approach would be manifestly unfair to the appellees who do not have an appropriate opportunity to answer such arguments. Our conclusion that there was no breach of trust committed in the sale of the Pimlico property also disposes

3. The evidence is quite clear that there were no serious offers on acceptable terms other than that of the Jockey Club. As to the lack of formal advertising, it is clear that the publicity concerning the sale of Pimlico negated any need for it.

of the contention that Mercantile was not entitled to the 2% commission which it paid to itself in connection with the sale. *See Madden v. Mercantile-Safe Deposit & Trust Co.,* 27 Md. App. at 49.

## Trustee's Commissions

By decree of May 11, 1977, Judge Ross awarded commissions on the income and corpus of the trust and a final distribution commission of 1% as provided in *Md. Code,* Estates and Trusts Art., § 14-103. The 1% commission was to be charged against the entire corpus and that portion of the award based on income and corpus commissions was to be charged ratably against the various shares held by Mercantile in trust from time to time since the death of the life tenant. The chancellor also authorized and approved the payment of $20,000 as a counsel fee for services rendered to the trustee.

All appellants noted appeals from this decree but only Audrey Cosden has presented an argument on the point. As the appellant notes, this portion of the appeal is concerned only with those commissions and fees authorized by the order of May 11 and does not involve any expenses in connection with Mercantile's defense of the counter-claimants' attempting to surcharge the Trustee, Mercantile. Cosden argues first that the Trustee breached its duty to make a prompt distribution of the corpus in failing to make partial distribution to her after the decree of May 30, 1973 ordered that she was entitled to one-fourth of the trust estate. She contends that there was no dispute as to her entitlement to at least that much of the estate.

The decree of May 30, 1973 upheld the legitimacy of Hallenbeck and Humphreys and determined the proportional share of the distributable corpus due to each beneficiary. Peter Madden entered an appeal from that decree to the Court of Appeals. *Madden v. Cosden,* 271 Md. 118, 314 A. 2d 128 (1974). This appeal required the Trustee to continue to hold in trust the corpus as well as the accumulated income that would have been otherwise distributable to Hallenbeck and

Humphreys. However, it did not challenge Audrey Cosden's right to at least 25% of the estate.

The Trustee petitioned the court for instructions as to further distributions on July 23, 1973. A hearing on the petition was held on November 21, 1973. The Trustee then had on hand undistributed income of about $49,000 and the principal of the trust estate amounting to about $3,045,000. By his decree of December 15, 1973, prior to the decision in the Court of Appeals, the chancellor directed retention of reserves by the Trustee for expenses and a partial distribution as follows:

(1) It ordered the Trustee to retain a portion of the principal of the trust as a reserve to secure reimbursement of the Trustee's reasonable expenses and compensation for its continued administration of the trust after January 4, 1972, exclusive of expenses incurred in the surcharge action. This was denominated "regular expenses and compensation." It also ordered the Trustee to retain a portion of the principal of the trust as a reserve for the Trustee's claimed reasonable expenses and compensation in defending the surcharge action. This was denominated "extraordinary expenses and compensation." A portion of this latter reserve was to be set aside from the principal of the trust estate as a whole, and the remaining portion thereof was to be set aside only from the distributive shares of Audrey Cosden, Peter Madden, Michael Madden and Christina Madden, who alone had prosecuted the surcharge counterclaim.

(2) It ordered the undistributed income collected since March 31, 1973, and future income, to be distributed one-fourth to Audrey Cosden, one-twelfth to each of Peter, Michael and Christina Madden, and one-fourth less one-sixth thereof, to each of Anne Hallenbeck and Jane Humphreys. The Trustee was authorized to retain the one-sixth of the income otherwise distributable to Hallenbeck and Humphreys on the theory that Peter Madden's appeal could adversely affect only one-sixth of the shares otherwise distributable to them.

(3) It ordered the balance of the principal of the trust to be distributed one-fourth to Audrey Cosden and one-twelfth

to each of Peter, Michael and Christina Madden. This, of course, left the disputed one-half share undistributed.

After these partial distributions required by the order of December 15, 1973 were made, the trust continued as to the balance of the principal of the trust estate amounting to about $2,000,000.

The Court of Appeals affirmed the lower court's decree that Hallenbeck and Humphreys were legitimate daughters of the life tenant, the mandate issued on March 4, 1974, and on March 11, 1974, these distributees petitioned for a distribution to them of portions of the corpus and income of the trust estate. By order dated March 14, 1974, the lower court directed the distribution to them outright of the principal and interest theretofore held for them in special accounts and periodically thereafter the income which would be derived from their shares of the reserves held for the Trustee's regular and extraordinary expenses and compensation. The Trustee distributed to each of these beneficiaries securities and cash having a then value of $592,921. After these distributions the Trust continued as to the principal of approximately $850,000 constituting the reserves held in five separate accounts until these accounts also were required to be changed by the lower court's order dated May 22, 1975.

We agree with appellant that a trustee has a duty, in winding up the administration of the trust, to make a reasonably prompt distribution of shares if it can do so without risk of loss either to itself or the beneficiaries. We disagree, however, with the contention that the delay in the distribution of appellant Cosden's share, under the circumstances of this case, required that the trustee be denied its commissions. The allowance of such commissions is a matter largely within the discretion of the chancellor and the propriety of such an allowance depends on the particular facts of each case. The chancellor's determination in this respect will not be disturbed in the absence of an abuse of discretion. *Stone v. Stone,* 230 Md. 248, 186 A. 2d 590 (1962); *Sokol v. Nattans,* 26 Md. App. 65, 337 A. 2d 460, *cert. denied,* 275 Md. 755 (1975). This rule has been recognized by the authorities

even where delay in distribution or other default on the part of the trustee has occurred but where there has been no bad faith or substantial loss to the estate. *See, Wasserman v. Locatelli,* 343 Mass. 82, 175 N.E.2d 914 (1961); *Katz v. Katz,* 104 N. H. 478, 190 A. 2d 425 (1963); *In re Trusteeship of Stone,* 138 Ohio St. 293, 34 N.E.2d 755 (1941); Annot., 110 A.L.R. 566 (1937); 90 C.J.S. *Trusts,* § 407. There is no indication here that the delay in distribution was the result of bad faith or caused any substantial loss to the estate. Although appellant Cosden makes such allegations in her brief, she points to no evidence sufficient to sustain them. The chancellor concluded that under the circumstances the trustee was entitled to a commission; he said:

> "With respect to Mrs. Cosden's suggestion that her share should have been immediately distributed, the usual practice is for a trustee to make one distribution of all assets to all beneficiaries entitled upon occurrence of the terminating event. Although in proper circumstances partial distribution may be made, and in some instances should be made, this is the rare exception and not the general rule. There is no basis in this case for penalizing the trustee for following the general rule rather than making an exception. . . ."

We have no basis on this record to disturb the chancellor's exercise of discretion.

In addition, Cosden complains because the trial court awarded final distribution commissions of 1% pursuant to *Md. Code,* Estates and Trusts Article, § 14-103 (e) which provides as follows:

> "Upon the final distribution of any trust estate, or portion of it, an allowance is payable commensurate with the labor and responsibility involved in making the distribution, including the making of any division, the ascertainment of the parties entitled, the ascertainment and payment of taxes, and any necessary transfer of assets. The allowance is subject to revision or determination by any court of

equity having jurisdiction. In the absence of special circumstances the allowance shall be equal to one-half of one percent upon the fair value of the corpus distributed."

Cosden alleges that there are no special circumstances upon which the court could grant the Mercantile final termination commissions double the amount set by statute. The argument is without merit. If the facts heretofore recited do not show special circumstances, we are unable to conceive of a situation in which special circumstances would exist.

Cosden next complains that the chancellor nevertheless "abuse[d] his discretion in not allocating the cost of Peter Madden's independent crusade in the ownership case to the interpleaded funds." [4] The Trustee Mercantile contends the question is not really presented. That portion of the record devoted to this question is meager. In the Cosden answer to the Trustee's petition she stated:

"First: The majority of the time of the Trustee and its counsel was devoted to issues concerning the right of Mrs. Hallenbeck and Mrs. Humphreys to take their shares; and any unusual expenses should be assessed against their shares alone ... That this respondent contends that the burden is upon Mr. Boyd [counsel for the Trustee] to satisfy the Court in the exercise of the Court's discretion of the exact nature of the services rendered, the time involved, his charges, the customary charges in the Baltimore community and the benefits which accrued to the estate as a result of his services and that no portion of the services relating to the right of Mrs. Hallenbeck and Mrs. Humphreys to take their shares be assessed against this respondent."

In her opening statement at the hearing on the question here discussed Cosden's counsel stated:

"With regard to the ownership issue, my client has never made any claim to anything more than her 25%

---

4. The "ownership case" was that portion of the controversy concerning the entitlement of Hallenbeck and Humphreys to a share in the estate.

share of the trust assets. The determination of the 50% that was at issue should not fairly be charged to anyone other than that share itself. Indeed, I do not know why the separate shares could not have been distributed to those who were not in controversy or the trustee never really raised any question as to the fact that my client received 25%, and that the three Madden children would divide 25%.

\* \* \*

"For Mrs. Cosden to be liable for any portion of the ownership costs would be really inconsistent with that which has been the general thought expressed in this Court and the Court of Special Appeals [5] that Mrs. Humphreys and Mrs. Hallenbeck should not be liable for any portion of the surcharge expenses in which they did not participate.

\* \* \*

"With respect to the counsel fee, I perhaps am somewhat more generous than my brother attorney, Mr. Madden, as to what Mr. Boyd is entitled to, but I think that which he's entitled to should come exclusively from the shares of the person for whom with respect to which his services were rendered, namely, the termination of the ownership case. Outside of filing the petition and engaging in certain discussions pertaining to distribution of income, there are very few services that Mr. Boyd rendered in the case which did not fall exclusively within the ownership case as to whether Mrs. Hallenbeck and Mrs. Humphreys should take or do not fall within the area of problems created by the fact that the trustee has, for its own benefit, sought to retain assets for its own benefit and protection. It may have a legal right to do so, but it should not result in an additional

---

5. Reference apparently to Madden v. Mercantile-Safe Deposit & Trust Co., 27 Md. App. 17, 48, 339 A. 2d 340 (1975).

charge to the beneficiary. Accordingly I feel that no portion, or at worse, only a very token or nominal fee should be charged against Mrs. Cosden."

At the same time with reference to this issue Peter Madden (appearing in proper person) said:

"Now, on the matter of allocation, I'm unaware that this has been raised by the trustee. It is apparently raised by Hallenbeck, Humphreys and Cosden, and they would like to have me pay all of the bills. For reasons which I have stated before, there was mutual benefit in the ownership proceeding from the point of view of at least the counter-claimants on the matter of the validity of the Nevada divorce, which was upheld by the highest court of the State of Maryland, which then made the adoption-disinheritance issue no longer viable for the trustee to use, but also to find out who the owners were so that there would be no gift tax liability."

Thereafter Mrs. Cosden's counsel stated:

"Your Honor, I would like to clarify one point where I may have misled Mr. Madden. Mrs. Cosden's petition on the allocation point is solely that the shares which were involved in the allocation or in the ownership case, should bear the expense, namely, Mrs. Humphreys and Mrs. Hallenbeck. While we did not agree with Mr. Madden's attack on the shares of his aunts, we do feel that he proceeded in good faith and with a sufficient measure of justification."

Cosden argues that in *Hitchens v. Safe Deposit & Trust Co. of Baltimore,* 193 Md. 62, 66 A. 2d 97 (1949), the Court of Appeals held that a trust beneficiary should not be required to bear the costs of the trustee's defense in a suit between other beneficiaries. In *Hitchens* the Court costs were ordered to be paid out of the only share of the estate which could have been affected by the appeal. With respect to the ownership aspect of this controversy the amount to which Audrey Cosden would have been entitled was in issue even on appeal.

552

Had Peter Madden ultimately succeeded in defeating the claims of Hallenbeck and Humphreys, Mrs. Cosden's share in the estate would have increased to one-half instead of one-fourth. Further, the chancellor's allocation of costs and expenses is not inconsistent with the view we took in our prior opinion relative to Hallenbeck's and Humphrey's lack of responsibility for the costs of the surcharge case. Those parties formally renounced and disclaimed any interest which they might have had in a surcharge recovery and, therefore, their shares would not be affected by the result either below or on appeal. The same cannot be said concerning appellant Cosden in the ownership case. In any event, we see no abuse of discretion in the trial judge's decision that the costs of the ownership case should be borne by all of the beneficiaries in these complex proceedings.

## Counsel Fees

In the order of May 11, 1977, the trustee was allowed $20,000 for legal services rendered by its counsel. At the hearing to determine the amount of such fee, appellants sought to examine Mercantile's attorney under oath. The chancellor refused to permit such examination stating his reasons as follows:

"I have expressed my opinion on that subject for sometime, or many times, and it is very simply this: That every member of the bar of this Court is an officer of this Court, and I do not intend to become a part of any body of law which says that I cannot rely on statements of counsel as to their truthfulness, and I refuse to take part unless specifically directed by the Court of Special Appeals and the Court of Appeals, either by rule or decision to permit an adversary to call an adversary attorney to the witness stand and cross examine him, and to me it is the beginning of the end of our common law adversary proceeding, and it is the beginning of the end to the dignity and decorum of the administration of justice as I have come to know it, and it is an

exacerbation of the public image of the law or an exacerbation of the diminution of the image of the bar in the eyes of the public, and certainly in this proceeding, knowing the parties to this proceeding and knowing what has happened in the past in these proceedings, I am not about to exercise what I consider to be my clear discretion to force any attorney to take the witness stand and be subject to cross examination unless he voluntarily wishes to do so. If he wishes to take the stand, then he's subject to cross examination, but the law, as I understand it, is clear that on an application for allowance of counsel fees, the court has broad discretion as to what it will consider, and it has broad discretion as to the manner in which the proceedings shall be held, and the tradition which has been expressly approved by the Court of Appeals and the Court of Special Appeals in a vast majority of the cases is that the application is made and determined in petition on behalf of the petitioner seeking the allowance.

"I have seen no reason up to this point why that method of proceeding is not perfectly appropriate in this case. If what you're doing is asking Mr. Waxter to take his turn at protecting the record on that point, fine.

"(Mr. Prem) [Counsel for Mrs. Cosden] Do I understand Your Honor to rule that we have no right of cross examination of Mr. Boyd?

(The Court) You can't cross examine a witness who is not taking the stand. That's simple. You can go back to McCormick on that. It's a matter of the law of evidence. You don't cross examine someone who is not on the witness stand. That's very easy.

"As I have indicated, then very shortly we will get to the point where I will hear Mr. Boyd [the Trustee's attorney for whose services compensation was being sought] explain why the facts set forth in his petition entitle him to the fee which he has stated he feels he is entitled to. You will have, as will Mr. Waxter

and Mr. Madden, an opportunity to respond to that if there are questions that come up in the course of that examination and in the course of what I have described, not to formalize these proceedings to the point of making it a trial, but during the course of what I have classified as closing argument, I'm sure that there will be questions asked which might be in the nature of cross examination, but they won't be your asking Mr. Boyd questions. There will be questions that you raise that I may want to ask Mr. Boyd about, which I'm sure he will answer and may elaborate on, but there will be no formal cross examination of Mr. Boyd for the reasons that I have previously indicated."

Shortly after this statement by the chancellor Mr. Boyd made his closing argument on the issue of attorney's fees. The record extract does not reveal whether any questions were propounded to him as suggested by the court.

We have found no authority for the proposition that an attorney cannot be examined as to the propriety of a fee which must be approved by a court. Although the question was raised in *Sokol v. Nattans, supra,* it was not decided because the record furnished on appeal was inadequate. It is clear that in a case such as this some evidence must be presented which supports the reasonableness and necessity of the legal fees being claimed. The award was based in part on the chancellor's own observations and familiarity with the case, and on documentary evidence prepared and submitted to the court by Mr. Boyd which purported to reflect the time and effort he had devoted toward advising Mercantile on the administration of the trust estate. Of course, where a claimed fee is challenged by an adverse party, he must be given the opportunity to rebut whatever evidence has been produced in support of the fee. It appears to us that the most natural and logical way to utilize that opportunity in this case was through the examination of Mr. Boyd. We do not share the chancellor's concern that allowing such an examination would be an affront to an attorney as an officer of the court. Rather, allowing such an attorney to be examined by the adverse

party merely recognizes that party's right to present his case through competent and material witnesses. We think the fears expressed by the chancellor were unfounded and appellants should have been given the opportunity to examine Mr. Boyd. Although it may be somewhat indecorous, such an examination is necessary where the fee is in dispute and the adverse party demands it.

Appellee argues that if error was committed by the chancellor in refusing to allow the examination of Mr. Boyd, such error was harmless. We are unable to agree with this contention because such an examination may have elicited facts which would have affected the chancellor's exercise of discretion in making an award of attorney's fees. The appellants are hardly in a position to make a proffer of what such an examination might bring forth. We will, therefore, modify the decree insofar as counsel fees were allowed and remand the case for further proceedings on that point alone.[6]

> *Decrees affirmed except as to counsel fee allowed in decree of May 11, 1977.*
> *Case remanded for further proceedings as to counsel fees.*
> *Appellants to pay costs.*

---

6. There are a number of motions pending in these proceedings on which the Court has not specifically ruled. The motions which will not become moot by our mandate are denied.